563 A.2d 1110

**Tom J. BILLMAN, et al.**

v.

**STATE of Maryland DEPOSIT INSURANCE FUND
CORPORATION, et al.**

**No. 96, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Sept. 27, 1989.

Certiorari Granted Dec. 28, 1989.

John R. Fornaciari (Robert E. Hebda, Robert M. Disch, Steele & Fornaciari and Eckert, Seamans, Cherin & Mellott on the brief), Washington, D.C., for appellants, Billman, Crysopt Corp., Epic Holdings Ltd. and Epicenter Consol., Ltd.

Clayton C. McCuistion, McClean, Va., pro se.

Leonard Meltz, Atlanta, Ga., pro se.

Neil J. Dilloff (Jonathan D. Smith and Piper & Marbury, on the brief), Baltimore (J. Joseph Curran, Jr., Atty. Gen. and Dennis M. Sweeney, Deputy Atty. Gen., Baltimore, of counsel), for appellees.

Argued Before GILBERT, C.J., ROSALYN B. BELL and JAMES S. GETTY, Associate Judge of the Court of Special Appeals (retired), specially assigned.

GILBERT, Chief Judge.

### Prologue

This appeal is an outgrowth of the savings and loan difficulties that have plagued Maryland for the past several years. It stems from an action by the Maryland Deposit Insurance Fund (MDIF) to recover depositors' monies allegedly misused through negligence and misappropriation. The case demonstrates the wisdom of McGuirk's Law that "any improbable event which would create maximum confusion if it did occur will occur." [1]

---

1. H.S. Kindlen from *Organizing the Technical Conference*, Reynolds Publishing Co. (1968).

We shall avoid recounting the myriad of facts presented to the jury in the more than four month trial of this case. It is enough to know that the Montgomery County Circuit Court returned verdicts in favor of MDIF against Tom J. Billman, Clayton C. McCuistion,[2] James B. Deerin Jr.,[3] Joseph C. Cunningham,[4] and Barbara A. McKinney,[5] Leonard Meltz Jr.,[6] Epicenter Consolidated Limited, Epic Holdings Limited, and Crysopt Corporation in varying multi-million dollar amounts.

### Issues

Billman posits a number of issues for our review, including the trial judge's declination to declare a mistrial despite the jury's consideration of ninety-four documents not in evidence.[7] Because of our disposition, we shall consider only that matter.

---

**2.** We were told on oral argument that Mr. McCuistion had settled with MDIF and dismissed his appeal. The records of this Court indicate McCuistion did not dismiss his appeal until September 11, 1989, six days after oral argument. The same applies to Epic Holdings, Ltd. and Epicenter Consolidated.

**3.** Mr. Deerin dismissed his appeal on April 28, 1989.

**4.** Mr. Cunningham dismissed his appeal on April 21, 1989.

**5.** Ms. McKinney did not appeal.

**6.** Mr. Meltz dismissed his appeal on August 1, 1989.

**7.** The other issues advanced by Billman are:
"II. The circuit court erred in dismissing the recoupment affirmative defense and counterclaims.
III. The trial court committed reversible error in instructing the jury.
  A. The circuit court committed reversible error in instructing that defendants were to be held to a higher standard of care than normally applicable to officers and directors of corporations.
  B. The circuit court committed reversible error in refusing to give defendants' two proposed instructions on the business judgment rule.
  C. The circuit court committed reversible error in refusing to give the defendants' instruction on proximate cause.
  D. The circuit court committed reversible error in instructing the jury on the burden of proof on the duty of loyalty."
The appellant Crysopt poses the additional issues:

## *Motion for Mistrial*

A box containing documents that were not in evidence inexplicably was sent along with the jury when it retired to deliberate. The deliberations consumed approximately 5½ days. On the evening of the fifth day, after the jurors had gone for the night, a court clerk discovered the egregious mistake and called it to the trial judge's attention. The next morning the judge assembled counsel and said:

"I want to take these couple of issues up with you in order. I discovered last night, or I was told last night, after a telephone conference about, I don't know what

---

"I. The circuit court erred in denying the motion of Crysopt to dismiss for lack of personal jurisdiction.

II. MDIF did not have standing to sue for alleged injuries sustained by the subsidiaries of Community.

III. The circuit court erred in construing the 'Federal Tie–In' and in repeatedly instructing the jury that the advice given to the defendants by their outside counsel on the Federal Tie–In Statute was wrong.

IV. The trial court committed reversible error by allowing MDIF to introduce inadmissable [sic] evidence.

. . . .

B. The circuit court committed reversible error in allowing MDIF to introduce the FHLBB eligibility exam and to introduce expert opinion that Community violated federal statutes and regulations.

V. The circuit court deprived defendants a fair opportunity to defend by excluding clearly admissible evidence.

A. The circuit court erred in using a 'Double Standard' against defendants in its rulings on the admissibility of expert testimony.

B. The circuit court committed reversible error in refusing to allow top state officials from testifying and in refusing to admit into evidence defendants['] Exhibit 950, 951 and 952.

C. The circuit court erred in excluding the expert testimony of Mr. Friedman on causation and amount of damages.

D. The circuit court committed reversible error in excluding all of the testimony of defendants' expert in the field of executive compensation.

E. The circuit court erred in excluding the expert testimony of Mr. Wallingford.

F. The court erred in excluding the other expert testimony of Mr. McGuirk.

G. The circuit court committed reversible error in overruling defendant's [sic] objections to plaintiffs' Exhibit 226, 231, 254, 255 and 293.

VI. The circuit court erred in granting MDIF's Motion for Judgment on the fourteenth counterclaim of Crysopt Corporation.

VII. MDIF was allowed to recover twice for the same damages."

time we finished, but about 6:30, I suppose, last night that about a *faux pas* that had occurred.

There was a box of exhibits that had been put aside with the lettering on it I.D. which contained a number of exhibits which got onto the cart that was pushed into the jury room and thus has at least been in the jury room for the entire length of the deliberation in this case.

.　　.　　.　　.　　.

Apparently ... [the court clerk] discovered that the box was not [sic] among those items which should not be in the jury room, and when the jury left last night, went into the jury room and found the box isolated by itself under the water fountain. Whether there is any particular significance to that, I don't know."

After considerable discussion as to the manner in which the aberration should be cured and the denial of several mistrial motions, the trial judge elected to interrogate the jury concerning whether the jurors viewed the exhibits that were not admitted into evidence. The panel was called into the courtroom where the judge inquired concerning their viewing of the box of non-admitted materials, which also included one exhibit that had been admitted. There were in the box a total of ninety-four exhibits.[8] The record discloses the following dialogue between the judge and the jury:

"THE COURT: Madame Forelady, this box, and some of you may want to—please feel free, if you wish, to turn it around. It says ID on one [side] and it has some other writing on the other. It was in the jury room underneath the water fountain. I'd like to know, Madame Forelady, if you can tell me whether or not you considered the contents of the box? Was that box one of the things that you all examined during the course of your deliberations?

---

8. One thousand, one hundred and thirty-eight exhibits were admitted into evidence. The jury, therefore, had before it those 1,138 plus the 94 that were improperly there.

THE FORELADY: I don't—I didn't really usually pull the files.

(Jury inaudible.)

THE COURT: Number 18?

THE FORELADY: Yes.

THE COURT: Plaintiff's exhibit 18?

(Jury inaudible.)

THE COURT: Now, let's be sure about that because I want to ask specifically—the one right in front of it that someone recognized, that is—is that plaintiff's exhibit, Billman, I mean, defendant Billman exhibit 18?

THE FORELADY: Yes, sir.

THE COURT: And you did consider that?

THE FORELADY: Yes.

THE COURT: All right. Fine. Thank you.

Now, can you tell me as to, regarding the other exhibits in that box, whether you recall having viewed those documents?

SPEAKER: 841A?

(Jury inaudible.)

THE COURT: Now, ladies and gentlemen, it would appear to me that you did examine, or it is likely that you examined everything that was in the room and then you didn't make anything special one way or the other of the contents of this box. Is that a fair statement?

THE FORELADY: Yes.

THE COURT: That is a fair statement. All right. I think then, with that ladies and gentlemen, once we've got everything back in the box, I ask you to please return to the jury room. Thank you very much.

(The jury leaves the Courtroom.)"

Further discourse among the court and counsel ensued. After the rejection of additional motions for a mistrial, the judge read aloud the "informal verdict" he had received from the forelady of the jury. The jury's findings were described by the court as "not a formal verdict" but "simply an indication to you [counsel, press representatives, and

spectators] as an evidentiary matter of what their verdict would have been had I called them out to formally announce it." [9]

Upon the completion of the reading of the "informal verdict," the jury was then escorted into the courtroom and told by the judge:

"Ladies and gentlemen of the jury, as you can probably guess by now, a bit of a glitch has occurred in our proceedings, and I have used the jury verdict form for other purposes outside of your presence. I am instructing you now that it was erroneous for you to have gotten the box which is sitting on the table and the contents of that box would be acceptance of defendant Billman exhibit 18, which is the first item in there.

What I am instructing you to do now is you'll have to go back into the jury room and redeliberate and disregard the contents of that box. I am going to give you a list which we have put together of the entire contents of that box, which has been used—I will give you back, Madame Forelady, the verdict form that you passed, given to us, and I want you then to redeliberate without those documents and reach a verdict, if you will, without it.

I think, also given the fact that it's almost twenty after one, that you may want also [to] get a lunch order in. I imagine you're getting hungry. I know certainly, I am.

So, with that ladies and gentlemen, I'm going to give you this handwritten list. It's one, two, three, four, five pages long, and once you've agreed upon your verdict, ladies and gentlemen, would you please knock on the door. Just the same procedure as you did before."

When the jury returned to the courtroom, its verdict mirrored the "informal verdict" previously announced by the trial judge.

---

**9.** The fact that we do not comment upon the propriety of the manner in which the trial judge revealed the jury's "informal verdict" or his manner in handling the situation neither implies our approval nor disapproval.

Having set out the background, we turn now to a consideration of those non-exhibits which were nevertheless examined by the jury. In so doing, we shall focus exclusively upon the plaintiffs-appellees' exhibits. In light of our disposition, we need not consider proposed exhibits offered by one or more defendants even though other defendants may have objected to the introduction of the exhibit.

A vetting of the plaintiffs' exhibits examined by the jury but not in evidence reveals:

1) A plaintiffs' proposed exhibit suggests that a cease and desist order was in process against Community Savings & Loan;

2) Another plaintiffs' proffered exhibit was a letter from the Federal Home Loan Bank Board (FHLBB) to the effect that Community Savings & Loan's application for account insurance should be denied because "Community/EPIC's operations do not fit with the FHLBB/FSLIC's [Federal Savings & Loan Insurance Corporation's] statutory mission." The Board's letter referred to Billman's sale of 30 percent of his assets to McCuistion and stated that the sale was unacceptable to FHLBB. The Board's letter went on to refer to a $13 million negative net worth that Community had as a result of the Billman–McCuistion sale. The letter further stated, "This is completely unacceptable to FHLBB."

3) An article from the *Wall Street Journal* questioning Community's accounting methods. The article reads in part: "Community S & L is using the most liberal accounting treatments available and playing the kind of games that have gotten many thrifts into trouble over the past few years."

4) A handwritten paper asking, "What are *real* liabilities?"

5) Part of the deposition of Barbara A. McKinney, together with several deposition exhibits. (See Md.Rule 4–326(a)).

6) A resolution concerning stock dividend payments to Series A Preferred Stock totalling $977,617.39.

7) A "Nationwide Appraiser's List."

8) A letter to Maryland Savings–Share Insurance Corporation (MSSIC) relative to whether a letter from MSSIC constituted a cease and desist order.

9) A handwritten paper stating in part: "1) Concerns—valuations—on property is over appraised."

10) Minutes of the Executive Committee of the Board of Directors concerning negotiations with MSSIC.

11) A 1988 letter from Management Consulting Services with enclosure of 1985 "Confidential Report" of Epic Partnership cash flow.

12) A paperwriting purporting to be a "partnership accounting" trial balance with attachments concerning Equity Programs Investment Corporation; Epic Mortgage, Inc.; and Community Savings & Loan.

13) Another partnership accounting.

14) An interoffice communication dated February 22, 1974 from the Office of the General Counsel of the FHLBB to the Office of Examinations and Supervision concerning the prohibition against having a subsidiary pay the parent corporation deferred Federal income tax liability.

15) A typewritten "Statement of Operations [by Community Savings & Loan] For the Period Ending *September 30, 1984.*"

16) Another Community Savings & Loan "Statement of Operations" but "For the Period Ending *October 31, 1984.*"

17) Community's "Statement of Operations For the Period Ending *January 31, 1985.*"

18) An article from *Appraisal Review Journal* Vol. 4, No. 3, Fall 1981, entitled, "Creative Finance and the Review Appraiser."

19) A photocopy of pages 1, 2, 3, 4, 5, 90, and 93 of *Harrison's Illustrated Guide,* copyright 1977.

20) A letter dated August 8, 1984 from the President of ESI Securities, Inc. to the President of Private Ledger

Financial Services, Inc., concerning the former's criticism of the latter.

We think it difficult, if not impossible, for a jury, after 5½ days of consideration of and deliberation on the 1,232 exhibits,[10] to reconsider its conclusions after first mentally subtracting 94 of the documents it had previously examined. That herculean task is made more arduous when the fact finder is furnished merely a list, with a few descriptive words, of the exhibits that are to be subtracted mentally from previous consideration.

The number of exhibits improperly before the jury comprises only 8 percent of the total 1,232. Yet, evidence is weighed, not counted. We ask: How much weight did the jurors give to the *Wall Street Journal* article? Was it weighed heavily or lightly? Was it a decisive factor, or was it ignored? The same questions might be asked with respect to each of the other nineteen non-admitted exhibits. Were any exhibits the "straw that broke the ... back" of the defense or the proverbial grain of sand that tipped the scale in favor of MDIF? Even if each of the non-admitted exhibits, standing alone, is deemed harmless, who can say what cumulative effect they had on the minds of the jurors? Did the exhibits totally or individually affect the verdicts? We are unable to answer with any degree of certainty the rhetorical questions posed. As a result, we are unable to declare that the matters improperly before the jury throughout the 5½ days of their deliberations did not in some manner influence the verdicts and deny due process to the appellants.

Although it can be argued that the instruction to reconsider a verdict, after ignoring certain previously examined exhibits, is similar to being told to disregard testimony heard at trial, there is, we think, a vital difference. Testimony is normally heard; it is oral and, theoretically, at least, forms no permanent impression in the minds of the

---

**10.** The 1,232 includes the 94 that were improperly before them.

jurors. Moreover, the opposing party has the opportunity to cross-examine, to offer counter-evidence, or to take appropriate measures to minimize the effect of the objected to and stricken evidence. That opportunity is denied when parties have no way of knowing that improper "evidence" is before the jury. Parties are unable to rebut, cross-examine, or argue against the weight of evidence they do not know the jury is considering. The matter before us then is not a question of the admissibility *vel non* of evidence but one of due process, a concept that is to the law what water is to life. Without water, life would wither and die; without due process, the law would suffer the same insalubrious fate.

■ We take it as a fundamental element of trial by jury that the information jurors glean about the case before them should come solely from the evidence presented at trial and not from extraneous sources. *See Thompson v. Commonwealth of Virginia*, 219 Va. 498, 500, 247 S.E.2d 707 (1978).

The issue presented in the matter *sub judice* does not appear to have been heretofore decided by a Maryland appellate court; other jurisdictions have, however, resolved the problem, although not in exactly the same manner. The Superior Court of Pennsylvania in *Commonwealth of Pennsylvania v. Hoke*, 381 Pa.Super. 70, 552 A.2d 1099 (1989), for example, dealt with a situation where a diagram not introduced into evidence was improperly submitted to the jury. Seven or eight minutes later the trial judge ordered the diagram removed from the jury room, and the jury was given precautionary instructions immediately after the exhibit was removed. The Superior Court said, "[W]hen exhibits not in evidence are given to the jury by court personnel, a new trial will not be ordered unless it is shown the evidence was so prejudicial that the defendant was denied a fair trial." *Id.* at 1102. The Pennsylvania Court implicitly placed the onus on the movant to demonstrate prejudice.

The Supreme Court of New York, on the other hand, put the burden on the non-moving party when it declared:

"[T]he rule is well settled that the delivery of papers to the jury not in evidence or which contain excluded matter, when or after it retires for deliberation without the consent of the court avoids the verdict unless the matters contained therein are not prejudicial, or if it appears that they were not read by any of the jury."

*Aiken v. Dunn,* 1 Misc.2d 215, 147 N.Y.S.2d 450, 452 (1955) (citations omitted). Compare *Public Operating Corporation v. Weingart,* 257 A.D. 379, 13 N.Y.S.2d 182, 186 (1939), where it is stated:

"Parties to a litigation should have their causes tried upon competent and relevant evidence submitted in open court where each side is afforded a fair opportunity of cross-examination. Documents not received in evidence may not be considered by a jury in their deliberations and a verdict predicated thereon must be set aside unless it can be shown that the jury could not have been influenced thereby."

It is no answer to say that the jury may think it was uninfluenced by the extraneous material. Courts in other States have held that it is impossible for jurors to say what effect the foreign matter had upon their individual or collective minds. *Palestroni v. Jacobs,* 10 N.J.Super. 266, 77 A.2d 183 (1950); *Hix v. Drury,* 5 Pick. 296, 22 Mass. 296 (1827). "The test," as then-Judge William J. Brennan wrote in *Palestroni,* "is capacity of the irregular matter to influence, not whether influence in fact resulted." 77 A.2d at 186.

■ Because the degree of prejudice, if any, that may arise as a result of a jury's considering matters not in evidence varies from case to case, no litmus paper test is possible. Each case must be considered on its own peculiar facts. We think, however, that the New York rule as announced in *Aiken v. Dunn, supra,* provides the better method of resolving that type of problem. We, therefore,

hold that whenever materials, documents, or matters not in evidence are, nevertheless, present in the jury room and examined by the jury, prejudice to the parties is presumed. The failure of the trial judge to declare a mistrial in the instant case constitutes reversible error. We, of course, recognize that the retrial of this protracted case is regrettable, but due process requires no less.

There remains a post-trial matter for us to consider. Shortly before this case was to be argued, counsel for MDIF moved to dismiss the appeals of Billman and Crysopt, a corporation that MDIF avers is his alter ego. The essence of the motion is Mr. Billman's alleged flight from justice.

MDIF asserts that "[t]here is an outstanding warrant for ... [Billman's] arrest and a criminal complaint pending in ... the case of United States v. Tom J. Billman, ... in the United States District Court for the District of Maryland." MDIF also charges that Billman "failed to appear on several occasions before the Circuit Court for Montgomery County" to be examined, under oath in aid of execution upon MDIF's judgment. Crysopt Corporation, MDIF says, "is a shell ... 100% owned by ... Billman," and it has "no real existence except to serve as a tool for ... Billman's financial dealings."

Maryland has not adopted the "Fugitive Appeal Doctrine" with respect to civil cases. It has, however, in a very few, non-published criminal opinions dismissed appeals wherein the appellant eloped while the appeal was pending.

The Fugitive Appeal Doctrine was recognized by the Supreme Court in *United States v. Sharpe*, 470 U.S. 675, 722, 105 S.Ct. 1568, 1594, 84 L.Ed.2d 605 (1985). The rationale for the doctrine is that a fugitive may not seek redress from the courts while simultaneously avoiding their jurisdiction. Put more simplistically, the doctrine says: "You can't seek the aid of a court while fleeing from it. You can't have it both ways."

The problem with MDIF"s motion is that Billman has not escaped and, indeed, as far as we are aware, has not been convicted of a crime. All of the cases, except one, relied upon by MDIF were criminal ones in which the defendant fled after conviction but before confinement or else had escaped from confinement. The one exception is a tax fraud civil suit. There the appellant was determined to have "willfully attempt[ed] to evade federal employment taxes."

Several Federal appellate courts have held that the "Fugitive From Justice" rule "should apply with greater force in civil cases where an individual's liberty is not at stake." *Conforte v. Commissioners of Internal Revenue*, 692 F.2d 587, 589 (1982). *See also Conforte v. Commissioner*, 459 U.S. 1309, 1310, 103 S.Ct. 663, 663, 74 L.Ed.2d 588 (1983), where then-Justice Rehnquist, sitting as a Circuit Justice, penned in an "Opinion in Chambers" that the Supreme Court has never extended the fugitive rule beyond cases involving a "criminal conviction from which the litigant is a fugitive." Justice Rehnquist noted, however, that "Courts of Appeal ... [have] done so on a number of occasions." 459 U.S. at 1312, 103 S.Ct. at 664.

Billman may or may not be considered a fugitive from justice. There is, we are told, a warrant for his arrest, but he certainly has not been convicted on that charge, and we are unwilling to divest a person of the right to seek redress by way of appeal of a real or imagined wrong because a post-appeal warrant has been issued in another case for his apprehension.

Furthermore, that Billman's attorneys were served with a notice compelling his appearance for deposition in aid of execution on judgment does not, as we see, compel dismissal of the appeal. Perhaps, had service been made on Billman personally, we would have a different view; but that is not the question before us.

The Fugitive Appeal Doctrine is a severe one, requiring a thorough examination of public policy. If it is to be adopted

in Maryland with respect to civil cases, the Court of Appeals should so declare. Absent that declaration, we deny MDIF's motion to dismiss the appeal as to Billman and Crysopt.

MOTION TO DISMISS DENIED; JUDGMENTS REVERSED AND CASE REMANDED FOR A NEW TRIAL.

COSTS TO BE PAID BY APPELLEES.