992 A.2d 503

**In re ADOPTION/GUARDIANSHIP OF DARJAL C. and Khaylelle C.**

**No. 399, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

March 29, 2010.

506

508

Brian L. Zavin (Nancy S. Forster, Public Defender, on the brief), Baltimore, for appellant.

Morgan Powell & Leslie Ridgway (Douglas F. Gansler, Atty. Gen., Kendra R. Jolivet, on the brief), Baltimore, for appellee.

Panel: WOODWARD, MATRICCIANI and CHARLES E. MOYLAN JR., (Retired, Specially Assigned), JJ.

WOODWARD, Judge.

After a hearing that lasted several days, the Circuit Court for Baltimore City, sitting as a juvenile court, terminated the parental rights of Ms. Dan'elle H. ("Ms. H."), appellant, as to Darjal C. and Khaylelle C. Ms. H. appealed to this Court from the judgment of the circuit court. In an unreported opinion, filed on September 5, 2008, we vacated the judgment and remanded the case to the trial court with instructions to determine whether the presumption in favor of Ms. H.'s right to the care and custody of her children was rebutted by "exceptional circumstances" or "unfitness" consistent with the teachings of *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 937 A.2d 177 (2007). *In re Adoption/Guardianship of Darjal C. and Khaylelle C.*, No. 1734, September Term, 2007, 181 Md.App. 740 (filed Sept. 5, 2008), slip op. at 14 (*"Darjal I "*). On remand, after a hearing on March 24, 2009, the trial court reaffirmed its prior decision and terminated Ms. H.'s parental rights as to Darjal and Khaylelle.

In this second appeal, Ms. H. presents one question for our review, which, in the words of her brief, is: Did the trial court err in terminating [Ms. H.'s] parental rights?

Because we hold that Ms. H.'s counsel lacked standing to file the instant appeal on her behalf, we shall dismiss the appeal, *sua sponte,* pursuant to Maryland Rule 8–602(a).

### *BACKGROUND*

Ms. H., the mother of Darjal and Khaylelle, has given birth to eight children, none of whom are in Ms. H.'s custody. For the purposes of convenience, we adopt and incorporate sub-

stantial portions of the factual and procedural history as set forth by Judge Daniel Long [1] in *Darjal I.*

> [Ms. H.'s] first child, Isaiah, was born in 1995 when Ms. H. was in foster care as a minor. Prior to this case, Ms. H. lost custody of Isaiah as well as her next three children, Destiny, Jaleel, and Isis. Her parental rights to Destiny, were involuntarily terminated on July 27, 2004, along with her rights to her third child, Jaleel, shortly thereafter. Ms. H.'s fourth child, Isis, lived with Ms. H. for three-and-a-half years before Isis was placed with Isis' paternal grandparents. Ms. H.'s fifth child, Darjal, was born April 4, 2003. Darjal was removed from Ms. H.'s custody through a shelter care proceeding and was adjudicated CINA on August 31, 2005. Khaylelle, Ms. H.'s sixth child, was born October 19, 2004. On March 1, 2005, Khaylelle was removed from Ms. H.'s custody and, following an adjudicatory hearing, was found to be CINA on April 18, 2006. Ms. H.'s youngest child, Aaron, was removed from Ms. H.'s custody shortly after birth and died in infancy a few months later.
>
> On May 27, 2004, the Baltimore City Department of Social Services ("Department") entered into a service agreement with Ms. H. The agreement of May 27, 2004 indicates that Darjal came to the attention of the Department because of allegations that Darjal had a severe diaper rash and that Ms. H. consumed alcohol and smoked marijuana in her children's presence, did not keep food in the house, and left dirty diapers lying around.
>
> Ms. H. was required under the May 27, 2004 service plan to enroll in drug treatment and attend parenting classes in 2004. Ms. H. was not referred to any additional or specialized parenting programs.
>
> On April 21, 2005, the Department developed a new service plan for Ms. H. The plan required that Ms. H. follow through with any recommended recreational and employment counseling and therapy, keep a clean house-

---

1. Judge Long was specially assigned to sit as a member of this Court.

hold, cease having overnight visitors, complete a psychiatric evaluation, and maintain regular visitation with her children.

In July 2005, pursuant to the plan, the Department referred Ms. H. to Hebron House, a provider offering counseling, psychiatric evaluation, and therapy services to children, adolescents, and young adults. After conducting psychiatric and adult psycho-social evaluations of Ms. H., Hebron House staff diagnosed Ms. H. with depression, bipolar disorder, and obesity.

Beginning in mid–2005, Ms. H. participated in therapy with Ms. Rosetta Johnson, a licensed social worker with Hebron House. During their meetings, Ms. Johnson discussed steps Ms. H. needed to take to regain custody of her children. Among those steps were cleaning and child-proofing her house and reducing the traffic in and out of the house. Ms. Johnson also worked with Ms. H. on anger management issues and on finding Ms. H. affordable housing.

When Ms. Johnson began working with Ms. H. in 2005, Ms. H. lived in subsidized housing on Lennox Street in Baltimore. In May 2006, Ms. H. was evicted from her residence. Over the next seven to eight months, Ms. H. lived in various locations including with her birth mother in Carroll County. In January 2007, Ms. H. rented a three-bedroom row house on Booth Street in Baltimore City, where Ms. H. was living at the time of the Termination of Parental Rights ("TPR") proceedings.

In late 2005, the Circuit Court for Baltimore City referred Ms. H. for an evaluation and bonding assessment by the Baltimore City Circuit Court Medical Services Division. Ms. H. initially declined the referral because of her experience with the Medical Services Division as a child and obtained an evaluation elsewhere. When Ms. H. returned with documentation of the evaluation, the Department refused to accept the documentation for lack of proper signatures of her evaluators. Ms. H. then agreed to be evaluated by the Medical Services Division.

Dr. Harriet Miller, the Deputy Chief Psychologist for the Medical Services Division, conducted Ms. H.'s evaluation and bonding assessment over the course of two days in February and March of 2006. During the evaluation, Dr. Miller took Ms. H.'s history, interviewed her, gave her a battery of psychological tests, and observed how she interacted with Khaylelle. Dr. Miller diagnosed Ms. H. with major depressive disorder, antisocial personality disorder, and borderline intellectual functioning.

On April 7, 2006, Dr. Miller issued a report on Ms. H. Dr. Miller recommended that Ms. H. not have care and custody of Khaylelle and that any visitation between Ms. H. and Khaylelle be supervised. Dr. Miller also suggested Ms. H. participate in psychotherapy with a licensed clinical psychologist and continue to receive services through Chimes, an agency that provides services to individuals with developmental disabilities. In her report, Dr. Miller concluded that Ms. H. "does not have the necessary controls to adequately parent a young child, and her volatility may constitute a threat to a child's safety." Dr. Miller further stated that Ms. H. "lacks the empathy necessary to provide effective nurturance and support to a child."

On July 13, 2005, to facilitate visitation between Ms. H. and her children, the Department arranged for one visit and then referred the matter to the Angel Foundation ("Foundation"), a supervised visitation center. The first visit at the Foundation took place on July 28, 2005. At that time, Ms. H. was given a schedule for the next six visits. Ms. H. missed one of the initial six visits.

Ms. H.'s next visit was on January 13, 2006, at which time she was given a schedule for visits from January 20, 2006, through March 20, 2006. On February 2, 2006, Ms. H. telephoned the Foundation to say that she could not attend the February and March visitation dates and to request that future visits be cancelled because Ms. H. was scheduled to give birth to her seventh child, Aaron, on February 14, 2006. In June 2006, visitation between Ms. H. and Khaylelle resumed at the Foundation. Between July 28, 2006, and

September 8, 2006, Ms. H. attended two visits with Khaylelle and missed two visits.

Although the Foundation prepared a schedule of visits through June 2007, it closed the case on April 18, 2007, due to the large number of cancellations and the difficulty the Foundation had consoling Khaylelle when Ms. H. did not show up for a visit that she had previously confirmed. Between 2005 and 2007, Ms. H. missed 22 visits and attended 14 visits that were scheduled by the Foundation.

After the Foundation stopped providing visitation for Ms. H. with her children, the court ordered the Department to make an alternative arrangement. To that end, the Department scheduled three visits for the summer of 2007. Ms. H. attended the first and third visits, at which both Darjal and Khaylelle were present, but Ms. H. did not attend or call to cancel the second visit. According to the testimony of the caseworker who arranged the visits, Ms. H. played with Khaylelle, then age two, but did not interact with Darjal, then age four.

Ms. H.'s history with Chimes began in 1997. Ms. Africa Dickerson became Ms. H.'s case manager at Chimes in 2001. Ms. Dickerson and Ms. H. developed a series of "goals" which, over time, included housekeeping, transportation, budgeting, and paying bills. According to Ms. Dickerson, Chimes suspended services for Ms. H. on two occasions. In January 2007, Ms. H. moved into her current residence which did not have gas, electricity, or running water as a result of actions taken by the prior resident, and Ms. H. had difficulty getting utilities started. When M[ ]s. H. refused to move out of the residence, Chimes services were suspended. Services were suspended again in May 2007 when Ms. H. refused to stay in the hospital for four to five weeks after she had back surgery. At the time of the TPR hearing, Ms. H. was only receiving minimal assistance from Chimes.

Ms. H. began working with Ms. Rosalind Fletcher from Chimes in 2001 and was continuing to do so at the time of the TPR hearing. Ms. Fletcher was familiar with Ms. H. as Ms.

Fletcher's sister was Ms. H.'s foster parent when Ms. H. was a teenager. Ms. Fletcher testified to her observations of Ms. H.'s interactions with Darjal and Khaylelle. Ms. Fletcher indicated that, based on her observations, Ms. H. did not have much interaction with Darjal. Ms. Fletcher also indicated that Ms. H. "wasn't close to [Khaylelle] and [Khaylelle] just seemed to not like [Ms. H.]." Ms. Fletcher testified that she overheard Ms. H. say to Khaylelle, "I didn't hold your sister a whole lot and I'm not going to hold you." Ms. Fletcher expressed her concerns with the number of people who came to Ms. H.'s house, questioned Ms. H.'s decision-making ability, and questioned Ms. H.'s tendency to "mak[e] a decision to do something with her money that is not really the best thing."

On September 13, 2006, the Department filed a Petition for Guardianship with the Right to Consent to Adoption or Long Term Care Short of Adoption with respect to Darjal and Khaylelle. . . .

\* \* \*

After several days of testimony and after considering the relevant statutory factors in [§ 5–323(d) of the Maryland Code (1984, 2006 Repl.Vol.) of the Family Law Article ("FL")], the trial court determined that it was in the best interests of Darjal and Khaylelle to terminate the parental rights of Ms. H. (and Mr. C.). The trial court first considered Darjal's case analyzing the § 5–323(d) factors.

As to FL § 5–323(d)(1), the trial court noted that "[a] number of different services, evaluations, [and] therapy" were provided to Ms. H. by "Chimes, Hebron [House], and the Department." The trial court placed special emphasis on the extent and nature of the services provided by Ms. Fletcher of Chimes to Ms. H. finding that Ms. Fletcher "has been consistent over the period of Darjal's case. She has been there. She has done everything that she could. She brought [Ms. H.] for groceries, medical appointments." The trial court noted that Ms. Fletcher was with Ms. H. 25 hours per week acting as Ms. H.'s guardian angel. The trial court stated that "having [Ms. Fletcher] along side her, caring for

her, taking her to things, has just put a great obligation on Ms. H. to cooperate." The trial court "[didn't] know how [a parent] get[s] services more than [what Ms. H. received through the Department]" commenting that the trial court had "never seen that before" and that "it just overwhelms [the court], what [Ms. Fletcher] has done for Ms. H." The trial court also noted that Chimes provided transportation services and parenting coaching to Ms. H. The trial court found that the Department had done a "poor job" coordinating visitation between Ms. H. and Darjal and the Department had been "inconsistent" in its efforts because of difficulty in contacting Ms. H. by telephone. The trial court stated that "DSS doesn't get any gold star in this case" for fulfilling its obligations. The trial court indicated that the Department did not adequately document its efforts to make contact with Ms. H., but at the same time, the trial court acknowledged that Ms. H., at times, was "just plain unavailable."

As to FL § 5–323(d)(2), the trial court acknowledged that Ms. H. made progress regarding her anger management, found housing, and completed the parenting program. Nevertheless, the trial court also acknowledged that Ms. H. had "not been consistent" and "failed to do what she had to do" beyond accepting the service plan from the Department. The trial court placed weight on Ms. H.'s failure to be in contact with the Department and failure to attend scheduled visits with Darjal. The trial court found that Ms. H. had not been in contact with Darjal's caregiver and had not made any monetary contribution to Darjal's support. The trial court acknowledged the "existence of a parental disability" with "the major psychological factor" for Ms. H. being her anger management. The trial court also acknowledged that Ms. H. suffers from bipolar disorder. The trial court, however, did not place much weight on these factors as the trial court felt the overwhelming support from Ms. Fletcher to Ms. H. made up for these challenges. Finally, the trial court found that no additional services could be offered by the Department in the next 18 months that would make it

possible for Darjal to be returned to Ms. H. as Ms. H. had already been provided with an overwhelming amount of assistance and services.

As to FL § 5–323(d)(3) and (4), the trial court found that Ms. H. involuntarily lost parental rights of two of her other children. Also, the trial court found that Ms. H. has "no bond with Darjal." In addition, the trial court found that Darjal is well adjusted to her foster home and to her placement in foster care.

The trial court also considered the FL § 5–323(d) factors with respect to Khaylelle. The trial court's analysis of the FL § 5–323(d) factors was similar to the analysis for Darjal. As with Darjal, the trial court considered the services provided by the Department. The trial court indicated that "with the exception of one case," the trial court had "never seen the services such as [were] provided by Ms. Fletcher [of Chimes] and Ms. Johnson [of Hebron House]" to Ms. H. on "such a really intimate ... [and] consistent basis."

The trial court gave great weight to the fact that Ms. H. missed 14 of the 36 visits scheduled with Khaylelle noting that Ms. H. should have made an effort to follow-up with the Department and reschedule the missed visits. The trial court also indicated that, although the "emotional ties with Khaylelle [were] better than with Darjal," Khaylelle "didn't seem to be bonded to [Ms. H.]."

*Darjal I,* slip op. at 1–7, 9–13 (footnotes omitted).

Based on its analysis of the FL § 5–323(d) factors, the trial court granted the 7 Department's petition for guardianship and terminated Ms. H.'s parental rights with respect to Darjal and Khaylelle.

### *Darjal I*

Ms. H. appealed to this Court, presenting two questions, one of which is relevant to the instant appeal: "Did the trial court err in terminating [Ms. H.'s] parental rights?" *Id.* at 1. According to Ms. H., the evidence was insufficient to support the termination of her parental rights. *Id.* at 8–9. Ms. H.

additionally argued that, even if the evidence was sufficient, the court erred in failing to make the required finding under *In re Rashawn H.* that Ms. H. was either unfit or exceptional circumstances existed to justify the termination of her parental rights. *Darjal I,* slip op. at 9.

This Court concluded that "[t]he trial court made no express finding of parental unfitness or the existence of an exception[al] circumstance that justified termination of Ms. H.'s parental rights." *Id.* at 14. Accordingly, we vacated the judgment and remanded the case to the trial court with the following instructions:

> If the trial court, on remand, concludes that the FL § 5–323(d) factors weigh in favor of the Department and support "exceptional circumstances" or "unfitness," then the trial court must expressly make such a finding and explain its reasoning consistent with the requirement of *In re Rashawn H.* We leave determination as to the necessity of further hearings or testimony to the discretion of the lower court.

*Darjal I,* slip op. at 14.

### *Further Proceedings on Remand*

On remand, the trial court scheduled a pre-trial hearing for January 23, 2009. At the hearing, Ms. H.'s counsel advised the court that she could not locate Ms. H. and requested a court order authorizing the use of the Parent Locator Service of the circuit court to find Ms. H. The Department's counsel also told the court that it had lost contact with Ms. H. In an order dated January 23, 2009, the trial court granted the request of Ms. H.'s counsel to employ the Parent Locator Service in an effort to locate Ms. H.

Two months later, on March 24, 2009, the trial court held the hearing required by our mandate. Ms. H. was not present at the hearing. Ms. H.'s counsel advised the court that she had attempted to get in touch with Ms. H. through "various avenues" to no avail. Ms. H.'s counsel then moved for a continuance, which motion was denied. The parties proceeded

to present argument from their respective counsel, no additional evidence being permitted by the trial court.

At the conclusion of the March 24, 2009 hearing, the trial court ruled:

> I'm not going to try to go through, again, the analysis of the evidence that I did previously. My analysis of the evidence has already been, I think, reviewed by the Court of Special Appeals.
>
> And as I read the opinion, perhaps because it's me reading something that would potentially criticize me, I didn't see anything in there where they took up any—even a single issue of what I said and said, "but Judge McHugh didn't look at this, or Judge McHugh was incorrect in making that finding."
>
> So I'm[,] at this point, going to adopt everything that I said regarding the facts and regarding the factors. Because then, the analysis in *Rashawn H.*, at 402 Md. 477, at page 499, 937 A.2d 177, it says, "The [FL] 5–323[d] factors, though couched as considerations in determining whether termination is in the child's best interest, serve also as criteria for determining the kinds of exceptional circumstances that would suffice to rebut the presumption favoring continued parental relationships and justify termination of that relationship."
>
> Well, those factors—what the Court is saying there is, the factors are still important. You can read this opinion as saying, throw out the factors, and I disagree with the way—the manner in which [Ms. H.'s counsel] said that—that the *Rashawn* determinations come first and factors are second. Because, in fact, that was what the concurring opinion wanted to do, but that was not the majority's opinion.
>
> So going back to this language, it seems to me that you look—we are directed by the *Rashawn H.* holding by that Court to look at the factors in [FL] 5–323[d] to see if, in there, there are any exceptional circumstances that come out from what the findings are there. And, certainly, I think those—those determinations I made with respect to

each of those factors show me that there are exceptional circumstances that do rebut the presumption of continuing a—in favor of continuing a parental relationship. And those exceptional circumstances do justify termination of that relationship.

As to unfitness, which is also mentioned in here, and I'm not going to try to find the precise quote. I think—I think that what we see in [Ms. H.] is really, clearly, unfitness because she could not even approach competency as a parent. She never got to the point where it would even be—I think reasonably considered that she would be able to take these children back.

She,—[Ms. H.], unfortunately, can't even manage her own life. And she had a huge, huge amount of help, as I mentioned, and as the Court of Special Appeals seemed to recognize in the person who was with her all the time. . . .

And she did have some way to make income, but she never translated that into the ability to take care of a child, to care for a child. And I think the facts also support a finding that the—that [Ms. H.] is unfit as a parent.

\* \* \*

And here's a parent who has shown no real ability to take over mothering. She's unfit. These other circumstances prove that she's not capable; prove that it's not in the best interest of the children; and their safety and health would not be found in returning them to her or in continuing the parental relationship with her.

So, for all those reasons, the Court will—I think I've already made a finding of termination of parental rights. I'm simply reiterating. I'm reaffirming my prior decision and giving the reasons in light of *Rashawn H.*

Ms. H.'s counsel noted an appeal on her behalf on April 1, 2009. Additional facts will be discussed in order to resolve the question presented.

## DISCUSSION

### Lack of Standing

The trial court entered judgment on remand on March 24, 2009. Ms. H.'s trial counsel filed a notice of appeal on behalf of Ms. H. on April 1, 2009, eight days later and obviously well within the 30 days provided for by Rule 8–202(a).[2] The record indicated, however, that Ms. H. was not present at the March 24, 2009 hearing and could not be located, even though her counsel had been trying to find her for over two months. At the time of the filing of her brief on September 11, 2009, counsel for the minor children informed this Court in her brief that to her knowledge, Ms. H. still had not been located.

 On October 23, 2009, this Court issued an order for Ms. H.'s counsel to show cause in writing why the instant appeal should not be dismissed, "because the appeal was apparently noted without the knowledge and authorization of the appellant." On November 3, 2009, Ms. H.'s appellate counsel filed a response indicating that he "had contact with [Ms. H.] since the hearing on March 24, 2009." The response did not affirmatively state that the current appeal was noted with the knowledge and express authorization of Ms. H. Indeed, at oral argument before this Court, Ms. H.'s counsel advised that he was unable to represent to this Court that express authorization had been obtained from Ms. H. prior to the noting of the appeal.[3] Ms. H.'s counsel also stated that he

---

**2.** Maryland Rule 8–202(a). Notice of appeal—Times for filing.

(a) **Generally.** Except as otherwise provided in this Rule or by law, the notice of appeal shall be filed within 30 days after entry of the judgment or order from which the appeal is taken. In this Rule, "judgment" includes a verdict or decision of a circuit court to which issues have been sent from an Orphans' Court.

**3.** We have purposely used the phrase "express authorization." Because a party must make the ultimate decision to pursue an appeal after being fully informed by the party's attorney "of the various legal avenues that are available," *State Comm'n on Human Relations v. Anne Arundel County*, 106 Md.App. 221, 241, 664 A.2d 400 (1995), any authorization to note an appeal must be based upon direct communication from the party to the attorney. In other words, a written commu-

had a conversation with Ms. H. in the Summer of 2009 in which she stated that she wanted to continue to prosecute the instant appeal.

■ In the case *sub judice*, we are confronted with the issue, not raised by the parties, of whether Ms. H.'s counsel had standing to note an appeal on behalf of Ms. H. when counsel did not have the express authorization to do so from Ms. H. In *State Commission on Human Relations v. Anne Arundel County*, 106 Md.App. 221, 233–36, 664 A.2d 400 (1995), we addressed the issue of whether standing to appeal could be considered by an appellate court *sua sponte*. We cited to the Court of Appeals' opinion in *Joseph H. Munson Co. v. Secretary of State*, 294 Md. 160, 448 A.2d 935 (1982), *aff'd*, 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984), wherein the Court examined

> both prior Maryland decisions in which the appellate court would not consider the question of lack of standing where the issue had not been properly raised by a defendant below, and cases suggesting that the standing of a party to maintain an action is an issue that an appellate court will address on its own motion.

*State Comm'n on Human Relations*, 106 Md.App. at 233, 664 A.2d 400.

Because the Court of Appeals did not resolve the conflict in *Munson*, we determined that "the second line of cases discussed in *Munson*, permitting the appellate court to raise the issue of standing *sua sponte*, to be persuasive." *State Comm'n on Human Relations*, 106 Md.App. at 235, 664 A.2d 400. We reasoned that " 'although the issue of standing may not be jurisdictional in nature, it does go to the very heart of whether the controversy before the court is justiciable. If the controversy is nonjusticiable, it should not be before the court, and therefore must be dismissed.' " *Id.* at 236, 664 A.2d 400

nication from the attorney to his or her client that a failure to respond to the communication would constitute an authorization for the attorney to note an appeal is, in our view, insufficient.

(quoting *Sipes v. Bd. of Mun. & Zoning Appeals*, 99 Md.App. 78, 87–88, 635 A.2d 86 (1994)). Therefore, we held that the issue of standing fell "within the category of cases, in addition to jurisdiction, that an appellate court may address although it was not raised by a party." *State Comm'n on Human Relations*, 106 Md.App. at 236, 664 A.2d 400.

In *State Commission on Human Relations*, James Tucker applied for an entry-level position of Firefighter II with the Anne Arundel County Fire Department. *Id.* at 228, 664 A.2d 400. Tucker's application was denied because of partial color blindness. *Id.* at 229, 664 A.2d 400. Thereafter, Tucker filed a complaint with the State of Maryland Commission on Human Relations ("Commission"), alleging that he had been discriminated against on the basis of his physical handicap. *Id.* Based on this complaint, the Office of General Counsel of the Commission filed a statement of charges on behalf of Tucker against the Anne Arundel County Fire Department and County Personnel Office. *Id.* at 230, 664 A.2d 400. A hearing was held before an Administrative Law Judge ("ALJ"), who concluded that Tucker was neither a handicapped person nor perceived as having a handicap, and thus was not entitled to relief on a claim of employment discrimination. *Id.* at 230–31, 664 A.2d 400.

Thereafter, the General Counsel of the Commission appealed the ALJ's decision to an appeal board of the Commission. *Id.* at 231, 664 A.2d 400. After a hearing, the appeal board determined that "Tucker and the Commission staff had not met the burden of proving by a preponderance of the evidence that the County's failure to hire Tucker constituted unlawful employment discrimination." *Id.*

The Executive Director of the Commission, in concert with the General Counsel of the Commission, then authorized the filing of a petition for judicial review of the appeal board's decision. *Id.* at 232, 664 A.2d 400. The petition was filed on behalf of the Commission, by and through its General Counsel, in the Circuit Court for Anne Arundel County. *Id.* The circuit court affirmed the appeal board's decision without

either party raising the issue of standing to maintain the judicial review proceedings. *Id.*

On appeal, this Court, *sua sponte,* raised the issue of "whether the agents of the Commission who authorized and sought judicial review of the [appeal] [b]oard's order had the authority to do so on behalf of the Commission." *Id.* In response to queries from this Court, the Commission conceded at oral argument that the Executive Director of the Commission and the Commission's General Counsel, not the members of the Commission, made the decision to seek review of the appeal board's decision. *Id.* at 240, 664 A.2d 400. Because the power to authorize judicial review rested exclusively with the "agency" under Section 10–222 of the Maryland Administrative Procedure Act, we concluded that "the Commissioners themselves must sanction any determination to adjudicate a contested employment discrimination case beyond the decision of an appeal board of the Commission." *Id.* at 241, 664 A.2d 400.

In reaching our conclusion, we analogized the relationship of the Commission and its General Counsel to "that which exists between an attorney and client, whereby the General Counsel is the attorney and the Commission is the client." *Id.* We then stated:

> Under Maryland law, **an attorney has no right on his own initiative to appeal from an order or judgment affecting the interests of his client.** *Brantley v. Fallston Hospital,* 333 Md. 507, 512[, 636 A.2d 444] (1994). Although an attorney must inform his or her client of the various legal avenues that are available to the client, **the client must make the ultimate decision as to the end he or she seeks.** *State v. McKenzie,* 17 Md.App. 563, 588[, 303 A.2d 406] (1973); *see also Brantley,* supra, 333 Md. 507[, 636 A.2d 444] (attorney's authority to file an appeal terminated upon the death of his client); . . .

*Id.* at 241, 664 A.2d 400 (emphasis added).

Therefore, we held: *"As it has not been demonstrated in this case that the Commissioners authorized judicial review*

*before it was initiated,* or that such decision-making authority was properly delegated to the Commission's Executive Director and General Counsel, *it therefore follows that the circuit court lacked the authority to entertain this appeal." Id.* at 242–43, 664 A.2d 400 (footnotes omitted) (emphasis added).

██ Similar to the General Counsel in *State Commission on Human Relations,* Ms. H.'s trial counsel made the decision to note the appeal on behalf of Ms. H. Not only did Ms. H.'s counsel not have Ms. H.'s express authorization to note an appeal, Ms. H. had no knowledge that an appeal was filed on her behalf. Ms. H.'s trial counsel had no contact with Ms. H. for more than two months prior to the March 24, 2009 hearing, and Ms. H.'s appellate counsel did not have any contact with Ms. H. until the summer of 2009, long after the noting of the appeal on April 1, 2009. Because Ms. H. "must make the ultimate decision" regarding the appeal and did not make such decision, her attorney did not have standing to file an appeal on her behalf on April 1, 2009.

██ Nevertheless, Ms. H.'s counsel contended at oral argument before this Court that, notwithstanding her lack of knowledge and express authorization to note the appeal, Ms. H. ratified the filing of the instant appeal. As previously stated, Ms. H.'s counsel advised this Court that in the Summer of 2009 he had a conversation with Ms. H. in which she indicated that she wanted him to continue to prosecute the appeal. In our view, such purported ratification was ineffective because it came well after the 30 day time period for noting an appeal had expired. *See* Rule 8–202(a); *State Comm'n on Human Relations,* 106 Md.App. at 242 n. 9, 664 A.2d 400.

In *State Commission on Human Relations,* this Court addressed the issue of ratification by the agency after the fact in a footnote. 106 Md.App. at 242 n. 9, 664 A.2d 400. We postulated the argument that the Commission Chairperson's execution of notice to the parties required by Rule 7–202(d)(2) constituted ratification by the Commission after the fact. *Id.*

Before we could analyze that argument, however, we stated that the record had to

**disclose, at a minimum, that the execution of the Rule 7–202(d)(2) notice by the Commission Chairperson came within the time during which a petition for judicial review could have been filed had the Commissioners themselves actually acted to authorize the seeking of such relief.** *See* Md. Rule 7–203 (requiring a petition for judicial review to be filed within thirty days after the date the agency sent notice of the order to the petitioner where the sending of such notice is required by law); *see also Switkes v. [John] McShain[, Inc.]*, 202 Md. 340[, 96 A.2d 617] (1953) (substitution of a proper appellant in an appeal originally taken by an improper party could not be considered a ratification of the original appeal, where the proper appellant did not enter the action within the time prescribed by law for noting the appeal); *Sipes v. Board of Municipal and Zoning Appeals, supra,* 99 Md.App. at 98[, 635 A.2d 86] (motion to intervene on appeal in an action in which none of the original parties had standing to take the appeal was untimely where period for appealing the decision had already expired).

*Id.* (emphasis added).

Because the appellant could not demonstrate that the Rule 7–202(d)(2) notice was executed within the 30 day appeal period, we were unable to consider whether such notice was the equivalent of ratification of the appeal by the Commission after the fact. *Id.*

The case of *County Council of Prince George's County v. Dutcher,* 365 Md. 399, 780 A.2d 1137 (2001), does not compel a different result. In *Dutcher,* the Prince George's County Council, sitting as the District Council ("District Council"), reversed the decision of the Planning Board that conditionally approved a preliminary plan of subdivision. *Id.* at 403, 780 A.2d 1137. Upon judicial review, the Circuit Court for Prince George's County reversed the decision of the District Council on June 9, 1999. *Id.* On July 7, 1999, the District Council's

attorney filed an appeal to the Court of Special Appeals. *Id.* at 409, 780 A.2d 1137. On July 13, 1999, "four days after the expiration of the 30 day appeal period, the District Council, met and for the first time, formally considered the Circuit Court's action, voting to pursue the appeal filed by its attorney." *Id.*

This Court dismissed the appeal as untimely, because the approval of the District Council came after the expiration of the 30 day appeal period. *Id.* at 409–10, 780 A.2d 1137. The Court of Appeals reversed this Court's decision, holding that the appeal was timely filed. *Id.* at 412, 780 A.2d 1137. The Court of Appeals observed that the District Council had

> a long-standing policy whereby its attorney is authorized and directed to file a protective notice of appeal whenever the District Council, for any reason, is unable to vote on an appeal during the prescribed statutory period for taking an appeal. The District Council thereafter acts, in the normal course of business, to ratify, or direct dismissal, of the appeal. There is no dispute that the District Council and its attorney followed the established policy in this case.

*Id.* (footnote omitted).

The Court further explained that, in the context of a governmental attorney-client relationship, "it is not uncommon to find an established policy giving the government attorney standing instructions and authority to take all actions necessary to protect the government client's appellate interests until such time as the client may adequately consider the matter." *Id.* at 413, 780 A.2d 1137. Thus the government client "rightfully may expect that the attorney will act to protect the client's right to appeal." *Id.*

The Court of Appeals distinguished our opinion in *State Commission on Human Relations* on the basis that in *State Commission on Human Relations* (1) the authority to determine whether to take an appeal had been delegated to the Executive Director and General Counsel, (2) there was no indication that the Commission ever elected to seek judicial review or ratified the filing of the petition, and (3) there was

no long-standing policy that authorized the ministerial act of filing a protective notice of appeal to be followed by the agency's ultimate action. *Dutcher,* 365 Md. at 415–16, 780 A.2d 1137.

In the case *sub judice,* the relationship between Ms. H. and her counsel is clearly different from that of a governmental agency and its house counsel. Ms. H., as an individual, is the one who must make the decision regarding whether or not to appeal. *See State Comm'n on Human Relations,* 106 Md. App. at 241, 664 A.2d 400. Here, she clearly did not make such decision, because she did not know that the appeal had been filed, much less authorized its filing. There was no long-standing administrative policy adopted by Ms. H. that authorized the ministerial act of filing a protective notice of appeal. Nor is there any authority for such policy when the client is an individual as opposed to a governmental agency.

The fact that the governmental agency in *Dutcher* could ratify the protective notice of appeal after the 30 day appeal period does not validate Ms. H.'s ratification of her counsel's appeal. The protective notice of appeal in *Dutcher* was made in accordance with the long-standing administrative policy, and the District Council's ratification of its attorney's action was made "in the normal course of business" at its meeting four days after the noting of the appeal. 365 Md. at 412, 780 A.2d 1137. Ms. H.'s purported ratification occurred in the Summer of 2009, months after the noting of the appeal, when her counsel was finally able to talk to her after Ms. H. was out of contact with her counsel since before January 23, 2009.

At oral argument before this Court, Ms. H. also invoked the Fugitive Appeal Doctrine as a basis for avoiding dismissal of this appeal. The Fugitive Appeal Doctrine is the legal principle undergirding the authority of an appellate court to "dismiss the direct appeal from a criminal conviction brought on behalf of one who is a fugitive at the time of dismissal." *State Deposit Ins. Fund Corp. v. Billman,* 321 Md. 3, 8, 580 A.2d 1044 (1990). Maryland, however, has not adopted the Fugitive Appeal Doctrine with respect to civil

cases. *Billman v. State Deposit Ins. Fund Corp.*, 80 Md.App. 333, 345, 563 A.2d 1110 (1989), *vacated on other grounds by Billman,* 321 Md. 3, 580 A.2d 1044 (1990). Ms. H. apparently is arguing that, because Maryland has not applied the Fugitive Appeal Doctrine to civil cases, the doctrine should not be used by this Court as authority to dismiss the instant appeal.

The short answer to Ms. H.'s contention is that this Court is not basing its decision to dismiss Ms. H.'s appeal on the Fugitive Appeal Doctrine. Indeed, in our view, it would be inappropriate to dismiss Ms. H.'s appeal under the Fugitive Appeal Doctrine. Ms. H. is not a fugitive from justice, and the record does not reveal that she has been convicted of any crime.

More importantly, the Fugitive Appeal Doctrine does not address the issue presented in the case *sub judice,* namely, the standing of an attorney to note an appeal when the client neither knows nor expressly authorizes such action and fails to ratify the same within the 30 day appeal period under Rule 8–202(a). There is nothing in the *Billman* decisions that suggests that Billman's counsel was out of contact with him during the 30 day appeal period, or that his counsel noted the appeal without Billman's knowledge and express authorization.

In sum, the record indicates that Ms. H.'s counsel noted the instant appeal without the knowledge and express authorization of Ms. H. Because it is Ms. H. who must make the decision to appeal and she did not make that decision, Ms. H.'s counsel did not have the right to note the appeal, and thus lacked standing to do so. Moreover, Ms. H.'s purported ratification of the filing of the appeal was ineffective, because such ratification occurred months after the expiration of the 30 day appeal period under Rule 8–202(a). Accordingly, this appeal must be dismissed.

### *Termination of Parental Rights*

Even if Ms. H.'s appeal had been properly taken, she would not prevail on the merits. Ms. H. argues that the trial court on remand did not follow this Court's instruction, be-

cause the "court failed to explain its reasons for finding that [Ms. H.] was unfit and that exceptional circumstances existed justifying termination of her parental rights." According to Ms. H., even if the trial court made the proper findings under *In re Rashawn H.*, "[t]he evidence does not support the court's decision to terminate [her] parental rights." We disagree and explain.

The Court of Appeals has "recognized that parents have a fundamental, Constitutionally-based right to raise their children free from undue and unwarranted interference on the part of the State, including its courts." *In re Rashawn H.*, 402 Md. at 495, 937 A.2d 177. The parental right, however, is not absolute, and "[t]he presumption that protects it may be rebutted upon a showing either that the parent is 'unfit' or that 'exceptional circumstances' exist which would make continued custody with the parent detrimental to the best interest of the child." *Id.* "[T]he kind of unfitness or exceptional circumstances necessary to rebut the substantive presumption must be established by clear and convincing evidence, not by the mere preponderance standard that applies in custody cases." *Id.* at 499, 937 A.2d 177.

In determining if terminating parental rights is in the best interest of the child, the factors set forth in FL § 5–323(d) "guide and limit the court." *Id.* The factors also serve "as criteria for determining the kinds of exceptional circumstances that would suffice to rebut the presumption favoring a continued parental relationship and justify termination of that relationship." *Id.*

Section 5–323(d), however,
does not permit the State to leave parents in need adrift and then take away their children. The court is required to consider the timeliness, nature, and extent of the services offered by DSS or other support agencies, the social service agreements between DSS and the parents, the extent to which both parties have fulfilled their obligations under those agreements, and whether additional services would be likely to bring about a sufficient and lasting parental adjust-

ment that would allow the child to be returned to the parent. Implicit in that requirement is that a reasonable level of those services, designed to address both the root causes and the effect of the problem, must be offered—educational services, vocational training, assistance in finding suitable housing and employment, teaching basic parental and daily living skills, therapy to deal with illnesses, disorders, addictions, and other disabilities suffered by the parent or the child, counseling designed to restore or strengthen bonding between parent and child, as relevant. Indeed, the requirement is more than implicit. FL § 5–525(d), dealing with foster care and out-of-home placement, explicitly requires DSS to make "reasonable efforts" to "preserve and reunify families" and "to make it possible for a child to safely return to the child's home."

There are some limits, however, to what the State is required to do. The State is not obliged to find employment for the parent, to find and pay for permanent and suitable housing for the family, to bring the parent out of poverty, or to cure or ameliorate any disability that prevents the parent from being able to care for the child. It must provide reasonable assistance in helping the parent to achieve those goals, but its duty to protect the health and safety of the children is not lessened and cannot be cast aside if the parent, despite that assistance, remains unable or unwilling to provide appropriate care.

*Id.* at 500–01, 937 A.2d 177.

 Therefore, before terminating parental rights, the court must consider "the relevant statutory factors," "make specific findings based on the evidence with respect to each of them," and also

**determine expressly whether those findings suffice either to show an unfitness on the part of the parent to remain in a parental relationship with the child or to constitute an exceptional circumstance that would make a continuation of the parental relationship detrimental to the best interest of the child, and, if so, how.** If the

court does that—*articulates its conclusion as to the best interest of the child in that manner*—the parental rights we have recognized and the statutory basis for terminating those rights are in proper and harmonious balance.

*Id.* at 501, 937 A.2d 177 (emphasis added) (italicization in original).

■ The court, however, is not required to recite the magic words of a legal test. As the Court of Appeals explained, the

mere incantation of the "magic words" of a legal test, as an adherence to form over substance, may not cause the Genie to appear and is neither required nor desired if actual consideration of the necessary legal considerations are apparent in the record.

*S. Easton Neighborhood Ass'n, Inc. v. Town of Easton,* 387 Md. 468, 495, 876 A.2d 58 (2005).

As stated by Judge Long in *Darjal I,* the trial court carefully analyzed and applied the FL § 5–323(d) factors to the facts of the instant case. Nevertheless, this Court vacated the judgment and remanded the case to the trial court, instructing that *In re Rashawn H.* commanded the trial court to go one step further and " 'determine expressly whether those findings suffice either to show' unfitness or exceptional circumstances and, if the findings show unfitness or exceptional circumstances, explain how." *Darjal I,* slip op. at 14 (quoting *In re Rashawn H.,* 402 Md. at 501, 937 A.2d 177).

After the hearing on remand, the trial court, acutely aware that *Darjal I* did not reverse the trial court's findings as to the FL § 5–323(d) factors, adopted its previous analysis of those factors. Relying on that discussion of the FL § 5–323(d) factors, the court ruled, among other things, that Ms. H. was "clearly" unfit, "because she could not even approach the competency as a parent;" she couldn't "even manage her own life;" and she was unable to translate her ability to generate income to taking care of a child. Finding that the circumstances "prove[d] that [Ms. H. was] not capable; prove[d] that it [was] not in the best interest of the children;

and their safety and health would not be found in returning them to her or in continuing the parental relationship with her," the court terminated the parental rights of Ms. H. as to Darjal and Khaylelle. Therefore, we hold that the findings of the trial court were not clearly erroneous and that the termination of Ms. H's parental rights based upon those findings was not an abuse of discretion.

**APPEAL DISMISSED; COSTS TO BE PAID BY APPELLANT.**