In Re: K.B., No. 52, September Term, 2025

**CHILD IN NEED OF ASSISTANCE (CINA) – PERMANENCY PLAN – INITIAL REVIEW HEARING –** Supreme Court of Maryland held that presumptive permanency plan of reunification established at time of disposition hearing in child in need of assistance ("CINA") case, in which child is placed out of home, is not permanency plan determined pursuant to Md. Code Ann., Cts. & Jud. Proc. (1974, 2020 Repl. Vol.) ("CJ") § 3-823 and that child must be provided hearing in which permanency plan is determined pursuant to requirements of CJ § 3-823.  In addition, following disposition hearing in which child is declared CINA and enters out-of-home placement, all parties are entitled to notice of date and time and purpose of hearing at which permanency plan will be determined or reviewed, not just notice that plan may be determined or changed at point in future.

Circuit Court for Baltimore County
Case No. C-03-JV-24-000804

Argued: April 8, 2026

IN THE SUPREME COURT

OF MARYLAND

No. 52

September Term, 2025

_____

IN RE: K.B.

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

_____

Opinion by Watts, J.

_____

Filed: June 22, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

In Maryland, a local department of social services may file a petition seeking to have a child found to be a child in need of assistance—generally referred to by the acronym "CINA." See Md. Code Ann., Cts. & Jud. Proc. (1974, 2020 Repl. Vol.) ("CJ") §§ 3-801, 3-809. CINA actions are designed to provide protection for children who are abused, neglected, or in need of care for other reasons, see CJ § 3-801(f), with the goal of ensuring that a child's best interests are served, while giving priority to preservation of the family, see CJ §§ 3-802(a), 3-809(a). If the juvenile court decides that a child is a CINA, the court must determine the services that the child requires, which may range from ordering services for the child and parents, such as counseling or parenting classes, or placing the child outside of the home. See CJ §§ 3-801(m), 3-819. After a petition is filed, regular review hearings must be conducted to monitor the child's status. See CJ § 3-816.2. If a child is placed outside of the home, under Maryland law, a permanency plan hearing must be held within 11 months of the child's placement to establish a long-term plan for the child's care. See CJ § 3-823.

In this case, the Baltimore County Department of Social Services ("the Department"), Petitioner, initiated an action in the Circuit Court for Baltimore County, sitting as a juvenile court ("the juvenile court" or "the court"), seeking to have an infant, K.B., declared a CINA. In the petition, the Department alleged that K.B. was a child in need of assistance (a CINA) because K.B. had been abused and neglected by her mother, H.B. ("Mother"). The Department described an incident in which a Baltimore Police Department (BPD) officer observed Mother engaging in abusive behavior with respect to K.B. on a public street, and intervened and arrested Mother. The Department stated that

K.B. had been "sheltered to the Department of Social Services due to concerns of physical abuse/neglect[,]" and that Mother had been the subject of an emergency mental health petition, after expressing suicidal ideations. According to the Department, Mother acknowledged having several mental health diagnoses.

The Department alleged that Mother has an "extensive child welfare history across several states including Maryland" and that her parental rights had been "terminated for multiple children due to concerns related to her mental health." The Department informed that Mother refused to provide the name of K.B.'s father and stated that she did not have any family. The Department advised that continuation of K.B. in Mother's home was contrary to the child's welfare.[1]

At an adjudication/disposition hearing, the juvenile court sustained the allegations in an amended petition, with Mother's agreement. The juvenile court declared K.B. a CINA, determined that it was not possible to return K.B. to Mother, and issued an order committing K.B. to the custody of the Department. Despite Mother having a history of prior involuntary termination of her parental rights with respect to other children, the juvenile court did not make a finding, under CJ § 3-812(b), that the local department was not required to provide reunification services because the case involved circumstances such as chronic abuse or prior involuntary termination of parental rights. As required by CJ § 3-819(f)(2), the adjudication/disposition order stated "that the permanency plan of

---

[1]The Department subsequently filed an "Amended CINA Petition[,]" which identified K.B.'s father based on information provided by Mother at the shelter care hearing.

reunification may be changed to another permanency plan, which may include the filing of a petition for termination of parental rights[,]" under specified circumstances. (Capitalization omitted). The juvenile court scheduled an initial review hearing for January 17, 2025, and the permanency plan hearing for June 16, 2025. After the adjudication/disposition hearing, the Department began providing reunification services to Mother.

At the initial review hearing, the Department recommended that K.B.'s permanency plan be changed from the sole plan of reunification with a parent to a concurrent plan of reunification and adoption by a relative or non-relative, and a magistrate adopted the recommendation. Mother filed exceptions to the magistrate's recommendation. The juvenile court overruled the exceptions and signed an order purporting to change the permanency plan from reunification to a concurrent plan of reunification and adoption by a non-relative.

Mother filed a timely appeal. The Appellate Court of Maryland held that the juvenile court established a permanency plan before it should have and reversed the judgment of the juvenile court and remanded the case to that court for further proceedings. See In re K.B., No. 295, Sep. Term, 2025, 2025 WL 2717343, at *1, *6 (Md. App. Ct. Sep. 24, 2025).

In this case, we must determine whether, after a child is declared a CINA, the juvenile court may change, at an initial review hearing, the permanency plan of reunification, which exists after a disposition in which a child is declared a CINA and removed from the home, to a permanency plan that includes both reunification with the

child's parent and adoption.

We hold that the permanency plan of reunification that is established after a disposition in which a child is declared a CINA and removed from the child's home is not a permanency plan determined under CJ § 3-823 and that a child must be provided a hearing in which a permanency plan is determined pursuant to the requirements of CJ § 3-823 and Md. Code Ann., Fam. Law (1984, 2019 Repl. Vol.) ("FL") § 5-525, within 11 months after a child committed under CJ § 3-819 enters an out-of-home placement. Additionally, all parties are entitled to reasonable notice, prior to a hearing at which a permanency plan will be determined or reviewed, of the date and time of the hearing and that, at the hearing, the permanency plan may be determined or changed, not simply notice after disposition that the permanency plan of reunification may be changed to a different plan at some future point in time. None of the above happened in this case.

We therefore affirm the judgment of the Appellate Court, which reversed the juvenile court's judgment and remanded the case to that court for further proceedings consistent with its opinion.

## BACKGROUND

### The CINA Petition: Factual Allegations

On August 15, 2024, the Department filed in the juvenile court a "CINA Petition with Request for Continued Shelter Care" for K.B. In the petition, the Department alleged that K.B. was a CINA due to the following circumstances. On August 13, 2024, BPD Officer Norman Jones saw Mother at the corner of Gay and E. Fayette Streets, walking with K.B. in a stroller. Officer Jones observed Mother become "verbally and physically

aggressive" toward K.B., yelling at K.B. to "shut the f[***] up" multiple times and "reaching down to hit the baby on or around her feet." When Officer Jones saw Mother pick up K.B.'s bottle and reach back as if she was going to hit K.B., he intervened and yelled for Mother to stop. Mother then picked up K.B. and began shaking her, which prompted Officer Jones to leave his car and remove K.B. from Mother. Officer Jones arrested Mother and called an EMT to transport K.B. to a hospital.

While detained, Mother was questioned by BPD personnel in an attempt to get information about K.B.'s father and any family support. Mother would not disclose the name of K.B.'s father and advised that she did not have any family. Mother made statements expressing suicidal ideations, which led officers to "emergency petition[]" her and transport her to Johns Hopkins Hospital for an evaluation. Mother also disclosed that she suffered from post-traumatic stress disorder (PTSD), depression, and anxiety, and denied taking medication or receiving any type of mental health treatment.

Mother "has extensive child welfare history across several states including Maryland" and "has had her parental rights terminated for multiple children due to concerns related to her mental health." Mother has had "her rights terminated in regard[] to her 4 year old daughter[,]" and "[t]he Department has guardianship of th[e] child."

K.B. was discharged from the hospital and placed in a Baltimore City foster home. The Department alleged that despite reasonable efforts in the form of the completion of a child protective services risk assessment and an attempt to locate relatives to prevent the need for out-of-home placement, continuation of K.B. in Mother's home would be contrary to her welfare. The Department requested that the Court continue K.B. in shelter care and

"make such findings and dispositions as the law provides[.]"

**Procedural History**

*1. Shelter Care and Adjudication/Disposition Hearings*

On August 15, 2024, the juvenile court held the shelter care hearing, and K.B. was "sheltered" to the Department. During the shelter care hearing, Mother provided the name and phone number of a person who she identified as K.B.'s father.

On September 6, 2024, in anticipation of the adjudication/disposition hearing, the Department filed a report titled "Court Report: Request for Commitment." In the report, the Department summarized the circumstances necessitating its intervention and advised that Mother had been discharged from the hospital on August 14, 2024, the day after her arrest and emergency petition. Since August 14, 2024, K.B. had been living in an agency-approved foster home. After an initial stay at a foster home in Baltimore City, K.B. had been moved to the same Baltimore County foster home in which her older sibling, R.B., was residing. Mother had already consented to the termination of her parental rights with respect to R.B. and the Department had guardianship of R.B. As of the date of the report, K.B. continued to reside in the foster home with her sister and was said to be "a beautiful baby who [was] adjusting well to her placements and to daycare."

The Department advised that K.B. is Mother's seventh child. When Mother lived in Massachusetts, between 2011 and 2018, the Massachusetts Department of Children and Families ("MA DCF") removed five of her children from her care. Mother's parental rights have been terminated with respect to four of the children, not counting R.B., and Mother had been charged and pled guilty to child pornography offenses that involved R.B. The

Department also reported that Mother has an extensive history of mental health conditions; MA DCF reported that Mother has been diagnosed with bipolar disorder with psychosis, PTSD, anxiety, and anger issues. In addition, according to the Department, Mother reported that she has previously been diagnosed with "Attention-Deficit/Hyperactivity Disorder, Intellectual Disability, and Specific Learning Disability[.]"

The Department noted that visitation between Mother and K.B. took place on August 26, 2024, and that the Department would continue to arrange visitation. The Department advised that at the shelter care hearing, Mother provided a name and contact information for K.B.'s father. According to the Department, Father had requested a paternity test that would be arranged.

The Department advised that Mother is eligible for disability benefits. According to the Department, on April 9, 2023, Mother completed a neuropsychological evaluation with a Dr. Eric Lane, Psy.D., which resulted in a diagnosis of "Unspecified Neurodevelopmental Disorder," PTSD, "Unspecified Bipolar-and Related Disorder, and Panic Disorder." The Department reported that, on June 29, 2023, and July 5, 2023, Mother completed a "Psychological Evaluation of Parenting Capacity" with a Dr. Robert Kraft. According to the Department, Dr. Kraft reported that Mother "'lacks minimally adequate parenting capacity, due to extremely low parent awareness skills, extremely low knowledge of appropriate parenting practices, disruptions in thought process, and disorganized behavior. Additionally, very low verbal reasoning skills inhibits concept formation and contributes to impairment in judgement [sic].'" The Department advised that Dr. Kraft reported that Mother's prognosis is "poor[,]" and that as a result of the evaluation, Mother

had been diagnosed with major depressive disorder, bipolar disorder, schizoaffective disorder, alcohol use disorder, unspecified personality disorder with paranoid and schizotypal features, and borderline intellectual functioning.

In addition, in 2024, Mother completed an "Evaluation of Sexual Risk" with a Dr. LaFaye Marshall, in which Dr. Marshall stated that Mother "'presents with risk factors that increase the likelihood of sexual recidivism[.]'" According to the Department, Dr. Marshall recommended that Mother "not have any unsupervised contact with any children, complete psychosexual psychotherapy and submit to random drug testing."

The Department advised that K.B. was born in March 2024, and that, after her birth, Mother had received services from the Carroll County Department of Social Services, but the case was closed when Mother moved to Baltimore City in May 2024. The Department stated that "[r]easonable but unsuccessful efforts were made to prevent or eliminate the need for a CINA finding on behalf of the Respondent child due to the emergent need. No relatives were identified."

As to disposition of the matter, the Department recommended that K.B. be declared a CINA and committed to the Department, with the Department granted "Limited Guardianship of [K.B.] for educational, medical, dental and mental health services, including but not limited to inpatient psychiatric treatment and the administration of psychotropic drugs, and for out of state travel[.]" The Department recommended that Mother complete:

- "a mental health evaluation and sign release of information form(s) for said services and follow recommendations until services are successfully completed"; and

- "parenting classes and anger management classes and sign release of information form(s) for said services[.]"

The Department recommended that visitation between Mother and K.B. be supervised and that Mother "obtain and maintain safe, stable, and hazard-free housing appropriate for" K.B.

On September 11, 2024, the Department filed an "Amended CINA Petition" updating information regarding the identity of K.B.'s father based on information obtained from Mother during the shelter care hearing. The amended petition is identical to the original petition, except that the allegation that K.B.'s father was unknown was replaced with information about the person identified by Mother.

On September 20, 2024, counsel for Mother, counsel for the Department, and counsel for K.B. appeared before the juvenile court for the adjudication and disposition hearing.[2] At the adjudicatory hearing, pursuant to an agreement between the parties, counsel for the Department summarized the allegations in the petition. Counsel for Mother advised the court that Mother would neither "admit nor deny the allegations" but was "not asking for an adversarial hearing." Counsel for Mother stated that Mother "was going through postpartum depression. She is engaged and desirous to work towards reunification in this case." The court sustained the allegations in the amended petition, stating that it was doing so "[b]y agreement."

At the disposition part of the hearing, the parties advised the court that they had

---

[2]Neither Mother nor K.B., who was six months old at the time, were present at the hearing.

agreed that K.B. should be declared a CINA and committed to the Department, with the Department granted limited guardianship, and supervised visitation for the parents. The following colloquy occurred as the court accepted the agreement:

[DEPARTMENT'S COUNSEL]: Today, the Department is asking that the Respondent be found a Child In Need of Assistance, and committed to the Department, with limited guardianship to the Department. The Department is recommending that visits between Mother and Respondent be liberal and supervised. Father, . . . if he is indeed established to be the Father, will need to contact the Department to establish visitation.

THE COURT: [K.B.'s counsel].

[K.B.'S COUNSEL]: Yes. Thank you, Your Honor.
On behalf of the Respondent, we are in agreement at this time that the child should be found a Child In Need of Assistance, and committed to the Department. We also agree to limited guardianship, and supervised visitation.
I did have a chance to see K.[B.] in her placement. I actually represent the sibling, R.B. (phonetic), as well. So, both children are in the same foster home. K.[B.] is doing wonderfully. She's in good health at this time, and ... the foster parent, is a long-term resource if needed in this case, as well. Her sibling is actually set, I believe, to be adopted really within the next couple months. But, for K.[B.]'s purposes, she's doing well. We're in agreement that she should be committed at this time.

THE COURT: [Mother's counsel].

[MOTHER'S COUNSEL]: Yes. Again, we are in agreement, and my client makes no admissions of any sort, and (unintelligible).

* * *

THE COURT: Okay.
I do find, based both on the agreement and upon my review of the Court Report and the other representations made, I will award or find for commitment to the Department with the guardianship, and supervised visitation at the discretion of the Department. Okay?

[DEPARTMENT'S COUNSEL]: Thank you, Your Honor. I believe we just need to get an initial review date, and a permanency date.

THE COURT: Yes.

Before adjourning the hearing, the court scheduled an initial review hearing for January 17, 2025, and a permanency planning hearing for June 16, 2025.

On the same day of the hearing, the court issued an adjudication/disposition order stating that the allegations in the CINA petition had been proven by a preponderance of the evidence and that "all paragraphs of the Amended CINA Petition dated September 11, 2024" were sustained. Under the section of the order labeled "Disposition[,]" the court declared K.B. to be a CINA, committed her to the custody of the Department, granted the Department temporary limited guardianship, and ordered that visitation between Mother and K.B. be "liberal and supervised as arranged by" the Department.[3] The order stated that Mother shall:

> (1) cooperate with the Department by providing family background information; (2) sign Release of Information forms regarding educational, medical, mental health, and substance abuse services and treatment that are necessary to provide services to the child and family; (3) allow scheduled and unscheduled home visits; (4) maintain consistent contact with the Department and update the Department about any changes in contact information or circumstances; (5) obtain/maintain safe[,] stable, and hazard-free housing appropriate for the Respondent; (6) submit to a mental health evaluation and follow said recommendations and sign release of information forms; (7) participate in parenting and anger management classes, and sign releases of information.

Consistent with CJ § 3-819(f)(2), pre-written language on the last page of the adjudication/disposition form order stated:

---

[3]The court ordered that Father contact the Department to be assessed for visitation before any visitation would be scheduled and that Father cooperate with the Department by providing family background information.

- 11 -

THAT THE PERMANENCY PLAN OF REUNIFICATION MAY BE CHANGED TO ANOTHER PERMANENCY PLAN, WHICH MAY INCLUDE THE FILING OF A PETITION FOR TERMINATION OF PARENTAL RIGHTS IF THE PARENTS: (1) have not made significant progress to remedy the circumstances that caused the need for removal as specified in this court order OR (2) are unwilling or unable to give the child proper care and attention within a reasonable period of time OR (3) the child has been in an out-of-home placement for 15 out of the last 22 months[.]

## 2. *The Initial Review Hearing*

In preparation for the initial review hearing, the Department filed a report dated January 7, 2025, titled "CINA Review Hearing[,]" which summarized information pertaining to the case under sections labeled, among other things, "Current Circumstances of Youth," "Status of Family," "Visitation," "Reasonable Efforts," "Permanency Plan," and "Recommendations." With respect to K.B.'s then-current status, the Department reported that K.B. was a 10-month-old baby who was thriving in a foster home with her sister and that there were no concerns. As to the status of the family, the Department advised that Mother was enrolled in parenting classes with "The Family Tree" but did not start the program due to "phone issues." As to housing, according to the Department, Mother had provided lease documentation and requested assistance with late rent. Mother was said to be looking for employment. And, the Department reported that Mother had been discharged from "Project Chesapeake due to lack of attendance with the program and [Mother] did not give proper notification to cancel or reschedule two consecutive mental health appointments."

The Department reported that Mother confirms for parent-child visits "on time" and comes to the Department for visits. The Department advised that there had been concerns

- 12 -

in the beginning that Mother had asked if the one-hour visits could end early. The

Department stated, however, that the "[v]isits are going well" and noted that two-hour visits

had been extended to Mother when staff had been unavailable or the facility had been

closed. According to the Department, Mother had advised the author of the report that she

is pregnant and "keeping the baby." The Department reported having made contact with

maternal relatives who initially expressed interest but "decided not to go forward with the

process to be a possible placement" for K.B.

Nonetheless, under the section of the report labeled "Reasonable Efforts," the

Department reported that it had developed a "case plan" that included a concurrent

permanency plan of reunification and custody and guardianship to a relative, stating:

> In compliance with COMAR 07.02.11.13 and SSA policy #13-2, within 60
> days after removal, the local department, together with the child's parent or
> legal guardian, shall develop a written case plan for each child in out-of-
> home placement. The case plan shall include concurrent permanency plans.
> Currently, Baltimore County DSS is working on a permanency plan of
> reunification and custody and guardianship to a relative. This is reflected in
> the case plan as well as the service plan completed with the youth and
> family.[4]

Under the section of the report labeled "Permanency Plan," the Department

recommended that the permanency plan be changed from reunification to "reunification

concurrent with adoption by non relative and relative." The Department stated that five of

Mother's children (which included R.B.) have been adopted, that another child is in the

---

[4]The Department also provided a list of the services/referrals that had been given in the case. The Department reported that it provided services such as making contact with Father, contacting Mother about visitation, and completing referrals for Mother to attend parenting and anger management classes.

custody of Mother's family, and that the Department had ongoing concerns regarding Mother's mental health and her ability to appropriately parent a child. The Department recommended the continued commitment of K.B. under the circumstances set forth in the adjudication/disposition order.

On January 17, 2025, a magistrate conducted the initial review hearing, as a remote proceeding, during which the Department's January 7, 2025 report was admitted into evidence. At the review hearing, counsel for the Department summarized information from the report, which in the Department's view indicated that Mother had "not necessarily [been] compliant." Counsel for the Department acknowledged that it was early in the process to change the permanency plan but stated that in light of Mother's "history with the other child[,]" the Department did "not necessarily feel that reunification by itself would be a successful plan." Counsel for the Department asked "that the plan change[] to a concurrent plan of reunification, concurrent with adoption by a non-relative," and that the case be reviewed in 6 months.

Mother's counsel argued that information in the report concerning Mother was incorrect and that the report demonstrated that the Department had reached a conclusion—the proposed change of the permanency plan from reunification to reunification and adoption—and attempted to justify the conclusion with a narrative in the report. Mother's counsel contended that in its report the Department attempted "to justify an inappropriate, entirely too soon conclusion to change the plan at the 5-month mark," and that "this [wa]s not even a permanency plan review hearing[.]" Mother's counsel asserted that, contrary to the information in the report, Mother had been extremely involved and engaged with K.B.

- 14 -

and had encountered one "blip" in being discharged from Project Chesapeake for missing two appointments but had immediately reengaged with the program.[5] Mother's counsel advised that Mother's visits with K.B. had gone "flawlessly[,]" that Mother had always confirmed the visits and been on time, and that she is "extremely appropriate" with K.B. Mother's counsel informed the magistrate that Mother had been advised by a Department worker that in March or April her visits with K.B. could switch to unsupervised visitation.

Mother, who was present at the hearing, addressed the magistrate on her own behalf. Mother advised that she understood that she had "a history in other states[,]" but that she was stable and had a place to live. Mother stated that she was "willing to do anything . . . for [her] daughter, because [she] love[s] her[,]" and that she "just want[ed] to be given a chance[.]"

---

[5]Mother's counsel advised that he had submitted documents demonstrating that Mother had reengaged with Project Chesapeake. Mother's counsel refuted information in the Department's report that indicated that Mother failed to attend anger management classes after the Department had paid for the classes. Mother's counsel advised that part of the attachments that he had provided were emails demonstrating that the Department acknowledged that it had only recently paid the provider of the anger management classes and that the classes were set to begin on February 25, 2025.

Mother's counsel also advised that he had submitted information from "The Family Tree" regarding Mother's attendance at parenting classes, which indicated that Mother is registered for and attending the classes. Mother's counsel contended that the information in the report regarding Mother not beginning parenting classes was incorrect.

In addition, Mother's counsel advised that he had submitted a letter from a Dr. Meredith Johnston of "Health Care for the Homeless" documenting that Mother was engaged in therapy and psychiatry and that she is compliant with appointments and medication. The magistrate accepted Mother's counsel's exhibits into evidence as Mother's Exhibits 1 and 2.

K.B.'s counsel advised the magistrate that he was "in agreement with the recommendations of the Department to continue [K.B.'s] commitment." With respect to the permanency plan, K.B.'s counsel stated:

> I'll just say that I understand the objections indicated by [Mother's counsel] and his client. I know we do still have a permanency plan set for June 16th at 9 a.m. in this matter. So, it is a bit early to recommend a permanency plan change.

K.B.'s counsel stated that he was "a little bit biased" because he had the "past experience with representing [K.B.'s] sibling in th[e] matter that led to adoption[.]" K.B.'s counsel pointed out that Mother's reenrollment in Project Chesapeake had occurred "just this week" and that after the adjudication Mother had "4 or 5-months" "to show some consistency in th[e] program." K.B.'s counsel stated: "So, that all being said, I'm not objecting to the addition of the adoption as the permanency plan at this point. I know it is a little bit early, and I do want [Mother] to have every opportunity to continue re-engagement." K.B.'s counsel stated that because "reunification is still on the table at this point," he did not think that the change in the permanency plan "prejudice[d Mother] too much, because she does have the opportunity, of course, to still work on reunification[.]"

The magistrate adopted the Department's recommendation, finding by a preponderance of the evidence that K.B.'s "permanency plan should be reunification with parents concurrent with placement with a relative for adoption, adoption by a non-relative."

On January 20, 2025, Mother filed timely exceptions to the magistrate's recommendation and requested a *de novo* hearing.[6]

### 3. *Exceptions to Initial Review Hearing: Decision of the Juvenile Court*

On March 10, 2025, the juvenile court conducted a *de novo* hearing on the exceptions. There is no indication in the record that the Department provided an updated report. At the hearing, counsel for the Department argued that, while "atypical," it was appropriate for the permanency plan to be changed at the initial review hearing because of the Department's history with Mother and her failure to meaningfully engage in services until recently. K.B.'s counsel adopted the Department's arguments and, like the Department's counsel, expressed concern about Mother's history. Mother's counsel rebutted the arguments by detailing Mother's progress since the initial review hearing—contending that, since the hearing, Mother had consistently participated in an anger management program, parenting classes, mental health treatment, and visitation with K.B., while also continuing to take her medication. Mother's counsel argued that the magistrate erred by changing the permanency plan before the permanency planning hearing, that a concurrent plan of reunification and adoption is impermissible because the plans are diametrically opposed, and that, even if concurrent plans are permitted, the plan for reunification in this case should not be changed given Mother's progress.

---

[6]CJ § 3-807(c)(2) provides that the party who files exceptions to a magistrate's recommendations may elect a hearing *de novo* or a hearing on the record before the court unless the party is the State in a proceeding involving juvenile delinquency.

After argument by the parties, the juvenile court asked whether "the Statute" allowed a permanency plan to be changed at a review hearing. The court heard from the parties and announced that it would take a recess to "review the statute and the cases[.]" Upon return, the juvenile court ruled that because a permanency plan of reunification had been determined at the disposition hearing, there was already a permanency plan in place and the plan could be changed at the initial review hearing. The court reasoned that, based on the language of the adjudication/disposition order, the parties were on notice that the permanency plan of reunification could be changed after the adjudication/disposition hearing. To illustrate the point, the court read aloud language from the last page of the adjudication/disposition order, which, like the rest of the order, contains preprinted/form language. The court stated:

> There was originally an adjudication disposition order that was entered on September 18, 2024, by a judge of this Court, and it indicates and orders in bold,
>> "The Court finds giving notice to all parties that the permanency plan of reunification, which the Court finds was the permanency plan in place at the end of the adjudication and disposition held before a judge of this Court, may be changed to another permanency plan which may include the filing of a petition for termination of parental rights if --" and the Court finds in the plain reading of that, where it says,
>> "It may be changed to another permanency plan, but it also may include the filing of a petition for termination of parental rights if the parents have not made significant progress to remedy the circumstances that caused the need for removal as specific in this Court order, or two, are unwilling or unable to give the child proper care and attention within a reasonable period of time, or three, the child has been out-of-home placement for 15 out of the last 22 months."

The court indicated that it had reviewed the Department's January 7, 2025 report and summarized information from the report, including that the Department recommended that the permanency plan change from reunification to a concurrent plan with adoption by a non-relative and relative. The court stated that it had reviewed CJ § 3-816.2 and that the statute provided the following guidance:

> "There must be a review hearing to review the status of each child under jurisdiction within 6 months after the filing of the first petition, and at the review hearing the Court shall evaluate the safety of the child, determining the continuing necessity for an appropriateness of out-of-home placement, determine the appropriateness of an extent of compliance with the case plan for the child, determine the extent of progress that has been made towards alleviating or mitigating the causes necessitating the Court's jurisdiction, and project a reasonable date by which the child may be returned to and safely maintained in the home, replace for adoption under a legal guardianship."

After reading aloud language from CJ § 3-816.2, the court stated that "subsection C of the statute" provides that, "[i]f the permanency plan for the child has been determined under the subtitle, a review hearing conducted by the Court under section of the subtitle shall satisfy the requirements of the section." Applying the guidance that it had obtained from CJ § 3-816.2, the court stated that it had considered the safety of the child and found that "currently the child is safe in the current placement." Addressing what it identified as the "second consideration[,]" the court "acknowledge[d] and commend[ed] the efforts Mother has made since predominately the last review hearing[,]"[7] but found that it was "still necessary and appropriate to have the child in out-of-home placement." Next, the

---

[7]The court was apparently referring to the initial review hearing that occurred before the magistrate, as there had been no prior review hearing.

court addressed what it labeled as number "[t]hree" and ruled as follows with respect to

K.B.'s permanency plan:

> Three, determine the appropriateness of and extent of compliance with the case plan for the child, the Court finds that the case plan indicated at time of the disposition going into the review hearing that it was reunification with the parent. There has been more recent -- and I'm not diminishing that at all -- more recent and more significant attempts to comply by Mother, but that was not the case at the last hearing to this extent. End each program in which the Mother is is [sic] either not yet completed based upon the parameters of the program or they are still is a continuing need to have services addressed the underlying issues.
>
> The Court has considered the extent of progress, and I was mentioning this already, that has been made towards alleviating or mitigating that causes necessitating the Court's jurisdiction, and the Court finds that there were efforts made. The Court is not convinced that they -- those concerns have been alleviated or mitigated. And to project a reasonable date, and the Court finds by which would have been the last hearing for the review, January of 2026, those efforts should be a reasonable date which the child may be returned to and safely maintained in the home, or placed for adoption under a legal guardianship.
>
> Having -- considering these things, the Court does not find that it is appropriate to have a sole plan of reunification. The Court finds that under the statute the Court has the authority to consider, under Family Law Article Section 5-525 F1, other plans that would be appropriate. And in viewing those things the Court adopts the recommendation of the Department and child's Counsel to change the plan at this time to reunification concurrent with adoption by a non-relative, because looking at the history that Mother has with the Department, the Court finds that there has to be a dual path for this child. Everyone is hopeful that there will be an opportunity to avail -- for Mother to avail herself of the services that are offered. However, based upon the historical concerns that the Court has, the Court finds there needs to be an allocation by this Court to consider the best interest of the child.

The court stated that, "as cited in In Re: Carl H., 349 Md. 402, a 2006 case[,]"

"'[a]lthough concurrent permanency planning is authorized in Maryland, we note that the

practice of having such concurrent plans that provide for reunification are family placement

and adoption and should be carefully scrutinized by the Court.'" The juvenile court stated

that it had "carefully scrutinized the recommended plan" and found that "there are significant efforts that have been made since the last hearing date," and that at the next hearing the court would "have an opportunity to review whether or not concurrent plans are still appropriate." The court stated:

> But based upon the totality of the circumstances, the Court finds that it has been proven to this Court by a preponderance of the evidence that the permanency plan shall be reunification with the parent concurrent by -- with adoption by a non-relative. The Court finds the due process was -- of Mother has been satisfied as there was notification of the request to change the plan within the Court report, and the Court finds the Court has authority to consider it within the statute, under 3-816.2. The Court finds that the Department's efforts were reasonable, and the Court finds that it's further in accordance with § 9-101 of the Family Law Article. There's no likelihood that abuse or neglect would occur with custody and visitation rights as follows finding that it's [sic] further continuation of the child and the child's home or placement is contrary to the child's welfare, and the child cannot yet be returned home.

The court ruled that "[v]istation at this time until the next hearing shall continue to be liberal and supervised as arranged by the Department," and that "an additional review hearing shall take place on April 7, 2025, at 1:30 p.m." The court stated that, at that time, it would "have an opportunity to see whether or not the continued compliance should equate or equal to different terms of visitation, and the permanency planning hearing is going to be on January [sic] 16, 2025 at 9 a.m."[8]

The court stated that it "denied" Mother's exceptions. The court signed the same order, titled "Initial Review Hearing Order Cts & Jud Pro 3-816.2," that had been signed

---

[8]The permanency plan hearing was scheduled for June 16, 2025, at 9 a.m.

by the magistrate on January 17, 2025, after the initial review hearing. The order contained

the following preprinted language with "x's" filled in the boxes:

The Court on this 17ᵗʰ day of **January, 2025** finds by the preponderance of the evidence,

☐ That the Respondent's Permanency Plan is
    ☒ Reunification with <u>parent(s)</u> *concurrent with*
    ~~☒ Placement with a relative for~~    ☒ ~~Adoption~~    ☐ Custody and Guardianship
    ☒ Adoption by a non-relative
    ☐ Guardianship by a non-relative
    ☐ Another Permanent Planned Living Arrangement because the following compelling reasons exist making the return home, adoption or guardianship not in the child's best interest:_____

Mother noted a timely appeal.

### Opinion of the Appellate Court of Maryland

On September 24, 2025, in an unreported opinion, the Appellate Court of Maryland

reversed the judgment of the juvenile court and remanded the case for further proceedings

consistent with its opinion. See K.B., 2025 WL 2717343, at *1, *6. On appeal, Mother

raised a single issue,[9] which the Appellate Court rephrased as "whether the juvenile court

erred when it changed K[.B.]'s permanency plan at the initial review hearing." Id. at *3.

The Appellate Court concluded that the juvenile court erred in changing K.B.'s

permanency plan at the initial review hearing, "six months before the scheduled

permanency plan hearing and without notice." Id. at *4. The Appellate Court pointed out

that, under CJ § 3-816.2(a), once a child comes under the juvenile court's jurisdiction, the

court "must hold a hearing to review the child's status no later than six months after the

---

[9]Mother phrased the issue as: "Did the juvenile court err in adopting a permanency plan of reunification and adoption by a relative or nonrelative at the initial review hearing where less than six months had passed since adjudication and [Mother] was making significant progress towards reunification?" K.B., 2025 WL 2717343, at *3 n.1.

filing date of the Department's first CINA petition and at least every six months thereafter."
Id. (citation modified). The Appellate Court explained that, under CJ § 3-823, "[t]he juvenile court has a parallel obligation to determine a permanency plan appropriate in a particular case and review it periodically[,]" and that the permanency plan hearing must be held no later than 11 months after a child is declared a CINA and a permanency plan review hearing must be held every 6 months thereafter. Id.

The Appellate Court concluded that, under CJ § 3-823, at a permanency plan hearing, the juvenile court must consider specific factors set forth by CJ § 3-823(e) and FL § 5-525(f)(1) when establishing a permanency plan and, under CJ § 3-823(h)(2), must follow a different set of steps when reviewing a permanency plan at a permanency plan review hearing. See id. at *5. The Appellate Court pointed out that CJ § 3-816.2(c) provides that "if a permanency plan for the child has been determined under § 3-823[,] a review hearing conducted by the court under § 3-823(h) shall satisfy the [] requirements of" the status review hearing required under CJ § 3-816.2. Id. (citation modified). However, "[t]he statute doesn't permit the court to conduct a status review hearing *in lieu of* a permanency plan review" hearing. Id.

The Appellate Court held that, at the initial review hearing, the juvenile court erred in concluding that K.B.'s permanency plan had been previously determined in the disposition order. See id. at *6. The Appellate Court concluded that, at the time of the initial review hearing, no court had determined K.B.'s permanency plan under CJ § 3-823 "because no court had considered the factors required by CJ[] § 3-823(e)(2) and FL § 5-525(f)(1)." Id. The Appellate Court determined that the process of determining K.B.'s

- 23 -

permanency plan must include consideration of the factors required by CJ § 3-823(e)(2) and FL § 5-525(f)(1), namely:

> K[.B.]'s ability to be safe and healthy in Mother's home, K[.B.]'s attachment and emotional ties to Mother, K[.B.]'s emotional attachment to the foster parent and R[.B.], the length of time K[.B.] has lived with them, the potential emotional, developmental, and educational harm K[.B.] could suffer if removed from the foster home, and the potential harm that K[.B.] could experience by staying in foster care for an excessive period of time.

Id.

The Appellate Court concluded that, "[b]ecause none of the prescribed factors had been considered when K[.B.]'s case came before the magistrate and the juvenile court, the court bypassed the determination process when it concluded that the disposition order had determined K[.B.]'s permanency plan for purposes of CJ[] § 3-823." Id. The Appellate Court held that the juvenile court was required to determine K.B.'s permanency plan pursuant to CJ § 3-823 and erred in failing to do so. See id.

**Petition for a Writ of *Certiorari***

On October 23, 2025, the Department petitioned for a writ of *certiorari*.[10] On December 19, 2025, we granted the petition as to the following rephrased question:

> Whether the juvenile court erred in establishing a permanency plan at the initial CINA review hearing that included both reunification and adoption.

---

[10]The Department raised the following question:

Did the [A]ppellate [C]ourt violate the party presentation principle and misconstrue § 3-823 of the Courts & Judicial Proceedings Article in addressing an issue not raised on appeal and holding that the juvenile court committed legal error in changing a child-in-need-of-assistance's permanency plan at the initial CINA review hearing?

- 24 -

See In re K.B., 492 Md. 699, 348 A.3d 888 (2025).

## DISCUSSION

### Standard of Review

We review factual findings of the juvenile court for clear error. See In re Adoption of Jayden G., 433 Md. 50, 96, 70 A.3d 276, 303 (2013). Issues of law, or a juvenile court's legal conclusions, are reviewed *de novo*. See id. at 96, 70 A.3d at 303. If there are no errors of law or clearly erroneous findings of fact, we will reverse a determination of the juvenile court "only if there has been a clear abuse of discretion." In re Yve S., 373 Md. 551, 586, 819 A.2d 1030, 1051 (2003) (citing Davis v. Davis, 280 Md. 119, 126, 372 A.2d 231, 234 (1977)).

### CINA Cases

The primary issue in this case concerns whether, at an initial review hearing involving a child who has been declared a CINA and committed to the custody of a local department of social services, a juvenile court may order that the presumptive permanency plan of reunification be changed to a concurrent plan of reunification and adoption. To discuss the issue in context, we provide a brief summary of the statutory framework governing CINA cases, adjudication/disposition hearings, and permanency plan determinations.

A child in need of assistance, or CINA, is a child who requires court intervention because the child has been abused, neglected, or has a developmental disability or mental disorder, and the child's parents or guardians are unwilling or unable to give proper care and attention to the child and the child's needs. See CJ § 3-801(f). If a local department

receives a complaint alleging facts that could support a finding that the child is a CINA, the department must file a petition, if the department determines that it is in the child's best interest.  See CJ § 3-809(a).  The petition must allege that the child is a CINA and detail the facts supporting the allegation.  See CJ § 3-811(a)(1).  The parties to a CINA case are the child who is the subject of the petition; the parent, guardian, or custodian of the child; and the petitioner—the local department of social services that brings the case on behalf of the State.  See CJ § 3-801(v)(1).

Pursuant to CJ § 3-816.2, within six months of the filing of a CINA petition, and every six months thereafter, the juvenile court must conduct a review hearing.  In relevant part, CJ § 3-816.2 provides:

> (a)(1) Except as provided in subsection (b) of this section, the court shall conduct a hearing to review the status of each child under its jurisdiction within 6 months after the filing of the first petition under this subtitle and at least every 6 months thereafter.
>
> > (2) At a review hearing under this section, the court shall:
> >
> > > (i) Evaluate the safety of the child;
> > >
> > > (ii) Determine the continuing necessity for and appropriateness of any out-of-home placement;
> > >
> > > (iii) Determine the appropriateness of and extent of compliance with the case plan for the child;
> > >
> > > (iv) Determine the extent of progress that has been made toward alleviating or mitigating the causes necessitating the court's jurisdiction; and
> > >
> > > (v) Project a reasonable date by which the child may be returned to and safely maintained in the home or placed for adoption or under a legal guardianship.

(c) If a permanency plan for the child has been determined under § 3-823 of this subtitle, a review hearing conducted by the court under § 3-823(h) of this subtitle shall satisfy the requirements of this section.

**Adjudication and Disposition Proceedings in CINA cases**

The process by which the juvenile court determines whether a child should be declared a CINA consists of two parts—an adjudicatory hearing and a disposition hearing. Once a petition is filed, the court holds an adjudicatory hearing to resolve the allegations in the petition. See CJ § 3-817. At an adjudicatory hearing, the Department must prove the allegations in a CINA petition by a preponderance of the evidence. See CJ § 3-817(c). CJ § 3-819 governs disposition hearings. Unless a CINA petition is dismissed, the court shall hold a separate disposition hearing after an adjudicatory hearing to determine whether the child is a CINA. See CJ § 3-819(a)(1).

The disposition hearing must be held on the same day as the adjudicatory hearing unless there is good cause to delay the disposition hearing or the CINA petition is dismissed. See CJ § 3-819(a)(1), (a)(2). At the disposition hearing, the court must determine whether the child is a CINA and, if so, the nature and extent of intervention necessary to protect the child's health, safety, and well-being. See Md. R. 11-216(c).

If the court finds that the child is not a CINA, the court must dismiss the case. See CJ § 3-819(b)(1)(i). If the child is found to be a CINA, the court may take a variety of actions to protect the child's health, safety, and well-being. See CJ § 3-819(b)(1)(iii), (c). If the disposition removes a child from the child's home, the disposition order shall:

(1) Set forth specific findings of fact as to the circumstances that caused the need for the removal; and

(2) Inform the parents, custodian, or guardian, if any, that the person or agency to which the child is committed may change the permanency plan of reunification to another permanency plan, which may include the filing of a petition for termination of parental rights if the parents:

> (i) Have not made significant progress to remedy the circumstances that caused the need for the removal as specified in the court order; and

> (ii) Are unwilling or unable to give the child proper care and attention within a reasonable period of time.

CJ § 3-819(f).

## Reasonable Efforts

CJ § 3-816.1(b)(1) provides that in a hearing conducted in accordance with CJ §§ 3-815,[11] 3-817, 3-819, or 3-823, the juvenile court "shall make a finding whether the local department made reasonable efforts to prevent placement of the child into the local department's custody."

CJ § 3-816.1(b)(2) states in relevant part:

In a review hearing conducted in accordance with § 3-823 of this subtitle or § 5-326 of the Family Law Article, the court shall make a finding whether a local department made reasonable efforts to:

> (i) Finalize the permanency plan in effect for the child; [and]

> (ii) Meet the needs of the child, including the child's health, education, safety, and preparation for independence[.]

---

[11]CJ § 3-815 pertains to shelter care hearings.

**Permanency Plan Hearings in CINA cases**

CJ § 3-823 governs permanency plans.  CJ § 3-823(b)(1)(i) provides that the court shall hold a permanency planning hearing to determine the permanency plan for a child no later than 11 months after a child is committed under CJ § 3-819.[12]  "[A] child shall be considered to have entered an out-of-home placement 30 days after the child is placed into an out-of-home placement."  CJ § 3-823(b)(2).  "If all parties agree, a permanency planning hearing may be held on the same day as the reasonable efforts hearing."  CJ § 3-823(b)(3).

Pursuant to CJ § 3-823(c)(1), "[o]n the written request of a party or on its own motion, the court may schedule a hearing at any earlier time to determine a permanency plan or to review the implementation of a permanency plan for any child committed under § 3-819 of this subtitle."  CJ § 3-823(c)(2) states that "[a] written request for review shall state the reason for the request and each issue to be raised."  "At least 10 days before the permanency planning hearing, the local department shall provide all parties and the court with a copy of the local department's permanency plan for the child."  CJ § 3-823(d).

For a child under 16 years old, the permanency plan may be one of the following, in descending order of priority, and "to the extent consistent with the best interests of the child":

1. Reunification with the parent or guardian;

2. Placement with a relative for:

A. Adoption; or

_____

[12]A permanency plan is "a plan specifying where and with whom the child shall live, and the proposed legal relationship between the child and the permanent caretaker or caretakers."  Md. Code Regs. 07.02.11.03(B)(39) (2026).

- 29 -

B. Custody and guardianship under § 3-819.2 of this subtitle;

3. Adoption by a nonrelative; [or]

4. Custody and guardianship by a nonrelative under § 3-819.2 of this subtitle[.]

CJ § 3-823(e)(1)(i).

CJ § 3-823(e)(2) provides: "In determining the child's permanency plan, the court shall consider the factors specified in § 5-525(f)(1) of the Family Law Article." The factors are:

> (i) the child's ability to be safe and healthy in the home of the child's parent;
>
> (ii) the child's attachment and emotional ties to the child's natural parents and siblings;
>
> (iii) the child's emotional attachment to the child's current caregiver and the caregiver's family;
>
> (iv) the length of time the child has resided with the current caregiver;
>
> (v) the potential emotional, developmental, and educational harm to the child if moved from the child's current placement; and
>
> (vi) the potential harm to the child by remaining in State custody for an excessive period of time.

FL § 5-525(f)(1).

CJ § 3-823(g) provides that, "[i]n the case of a child for whom the court determines that the plan should be changed to adoption under subsection (e)(1)(i)3 of this section, the court shall":

> (1) Order the local department to file a petition for guardianship in accordance with Title 5, Subtitle 3 of the Family Law Article within 30 days or, if the local department does not support the plan, within 60 days; and

(2) Schedule a TPR [termination of parental rights] hearing instead of the next 6-month review hearing.

CJ § 3-823(h)(1) provides that "[t]he court shall conduct a hearing to review the permanency plan at least every 6 months until commitment is rescinded or a voluntary placement is terminated." CJ § 3-823(h)(2) sets forth the factors that a juvenile court must consider at a permanency plan review hearing.

## Relevant Case Law

In CINA cases, at disposition, the presumptive permanency plan is reunification, unless there are compelling circumstances that warrant a different permanency plan at the outset. See Yve S., 373 Md. at 582, 819 A.2d at 1048-49. The presumption is rooted in the Constitution of the United States and the best interest of the child standard. See id. at 565-66, 569-70, 819 A.2d at 1038-41. Among the rights protected by the United States Constitution "are a parent's Fourteenth Amendment liberty interest in raising his or her children as he or she sees fit, without undue interference by the State." Id. at 565, 819 A.2d at 1038 (footnote omitted). A parent's fundamental right to raise a child is not absolute. See id. at 568, 819 A.2d at 1040. We have held that "the best interests of the child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute." Id. at 570, 819 A.2d at 1041 (citation modified). Maryland has adopted "in termination of parental rights[] . . . proceedings, a *prima facie* presumption that a child's welfare will be best served in the care and custody of its parents rather than in the custody of others." Id. at 572, 819 A.2d at 1043 (citation modified). Where "the best interest of the child is the applicable standard, the presumption exists, until rebutted, that

it is in the child's best interest to be placed with a parent." Id. at 572, 819 A.2d at 1043.

Concurrent permanency plans of reunification and adoption may be ordered but are disfavored. In In re Karl H., 394 Md. 402, 405, 906 A.2d 898, 899 (2006), we held "that a concurrent permanency plan ordered at the time of the permanency planning hearing and which provides for both reunification and adoption is an appealable interlocutory order." (Footnote omitted). In doing so, we observed that a concurrent permanency plan "is authorized in Maryland" but that concurrent plans of reunification and adoption "should be scrutinized carefully by the court." Id. at 422, 906 A.2d at 909. We explained that concurrent plans of reunification and adoption—as opposed to merely contingency planning, which aims for reunification while still permitting the local department of social services to begin making contingency plans for adoption—need to be carefully scrutinized because they may be "diametrically inconsistent" and not give the local department or the parents any "real guidance and can lead to arbitrary decision-making on the part of" the local department. Id. at 422, 906 A.2d at 909. When a court establishes a permanency plan that includes adoption—whether concurrently with reunification or as the sole plan— the court is required to schedule a TPR (termination of parental rights) hearing and order the local department to file a petition for guardianship. Id. at 422-23, 906 A.2d at 909-10; see also CJ § 3-823(g). As such, we stated:

> If the court approves a permanency plan that calls for reunification or family placement, that should be the paramount goal. It should not share the spotlight with a completely inconsistent court-approved goal of terminating parental rights, especially when the inconsistent plan calls for a TPR petition to be filed before the next scheduled court review of the permanency plan.

Karl H., 394 Md. at 422, 906 A.2d at 909.

The Department contends that the juvenile court did not err in establishing K.B.'s permanency plan at the initial review hearing because: (1) the permanency plan determination occurred before CJ § 3-823(b)(1)(i)'s 11-month deadline; (2) the hearing satisfied the substantive requirements of a permanency plan hearing; (3) Mother received all of the notice to which she was legally entitled; and (4) the juvenile court's statement that it was "chang[ing]" K.B.'s permanency plan has no effect on the legality of its decision.[13]

Mother argues that the juvenile court erred in adopting at the initial review hearing a concurrent permanency plan of reunification and adoption because: (1) the court did not apply the requisite FL § 5-525(f)(1) factors; and (2) applying the required FL § 5-525(f)(1) factors to the evidence in the record would have resulted in the juvenile court maintaining reunification as the sole permanency plan.

We conclude that the juvenile court erred in finding that K.B.'s permanency plan had been determined at disposition and that, in purporting to change the plan at the initial review hearing, the court did not consider the factors that a court is required to consider under both CJ § 3-823 and FL § 5-525(f)(1) in determining a permanency plan.

After a disposition hearing in which a child is declared a CINA and committed to an out-of-home placement, reunification is the presumptive permanency plan. See Yve S.,

---

[13]Like the Department, K.B. contends that the judgment of the Appellate Court should be reversed and that the juvenile court did not err in ordering a concurrent plan of reunification and adoption.

373 Md. at 582, 819 A.2d at 1048-49. A disposition in which a child is committed to the custody of a local department and placed outside of the home establishes a presumptive permanency plan of reunification, without the necessity of a ruling or a determination of the permanency plan by the court. See CJ § 3-819(f). Although the Appellate Court referred to the presumptive permanency plan as the "default" permanency plan, it reached the same conclusion. See K.B., 2025 WL 2717343, at *4, *6. The Appellate Court explained that, after the disposition hearing, the juvenile court's order "established the permanency plan of reunification by statutory default" and that if establishing a permanency plan of reunification by default "were a proper substitute for a permanency plan hearing, the process mandated by CJ[] § 3-823(e) would be meaningless." Id. at *6. We agree.

CJ § 3-802 provides that one of the purposes of the subtitle is "[t]o conserve and strengthen the child's family ties and to separate a child from the child's parents only when necessary for the child's welfare[.]" CJ § 3-802(a)(3). That reunification is the presumptive permanency plan is reflected in CJ § 3-819(f), which provides in relevant part that, in cases where the disposition involves removing a child from the child's home, the order shall:

> (1) Set forth specific findings of fact as to the circumstances that caused the need for the removal; and

> (2) Inform the parents, custodian, or guardian, if any, that the person or agency to which the child is committed may change the permanency plan of reunification to another permanency plan, which may include the filing of a petition for termination of parental rights[.]

Because CJ § 3-823 and FL § 5-525(f)(1) require that mandatory factors be considered by the juvenile court in determining a permanency plan, we cannot conclude that a presumptive permanency plan of reunification established at disposition is the equivalent of a permanency plan determined under CJ § 3-823. Such a finding would render the requirements for determining a permanency plan under CJ § 3-823 and FL § 5-525(f)(1) pointless. Concluding as the juvenile court did—that K.B.'s permanency plan had already been determined at disposition—would be the equivalent of concluding that at disposition whenever a child is committed to an out-of-home placement, establishing a presumptive permanency plan of reunification is the same as the court determining a permanency plan pursuant to CJ § 3-823. Such a conclusion would render hollow CJ § 3-823(b) and (e) and FL § 5-525(f)(1) because the juvenile court will have already "determined" at disposition a permanency plan for every "child committed under [CJ] § 3-819 . . . [who] enters an out-of-home placement[.]" As a result, no permanency planning hearing would need to be held, and none of the factors set forth by CJ § 3-823(e)(2) and FL § 5-525(f)(1) would be required to be considered.

At a permanency plan hearing, the juvenile court must determine a child's permanency plan in the manner described in CJ § 3-823(e)(1) and (2)—in particular, CJ § 3-823(e)(2) provides that, "[i]n determining the child's permanency plan, the court shall consider the factors specified in § 5-525(f)(1) of the Family Law Article." A permanency plan's central purpose is to ensure a goal for a child's long-term placement that is in the child's best interest. See, e.g., In re Damon M., 362 Md. 429, 436, 765 A.2d 624, 627-28 (2001). Reunification is the plan that is given the highest priority in the statutory scheme.

See CJ § 3-823(e)(1)(i)1. Under FL § 5-525(f)(1), in determining a permanency plan, a court is required to consider factors including the child's ability to be safe and healthy in the child's parent's home, the child's emotional attachment and ties to the child's natural parents, and the potential harm to the child by remaining in State custody for an excessive period.

The record demonstrates that at the *de novo* hearing on Mother's exceptions, in ordering that K.B.'s permanency plan be changed, the court did not consider the factors set forth in FL § 5-525(f)(1). The court stated that the permanency plan had been determined at disposition, notice had been given in the report of a request to change the plan, and that the court was "reviewing same under this statute of 3-816.2[.]" The court stated that it had determined that, under CJ § 3-816.2(c), if a "permanency plan for the child has been determined . . . , a review hearing conducted . . . under section of the subtitle shall satisfy the requirements of the section." The court discussed aloud factors set forth in CJ § 3-816.2(a)(2) that are considered at a review hearing—such as "the safety of the child" in the current placement, efforts made towards "alleviating or mitigating th[e] causes necessitating the Court's jurisdiction[,]" and "the appropriateness of and extent of compliance with the case plan for the child"—and how the factors applied to K.B.'s circumstances. After discussing the factors set forth in CJ § 3-816.2(a)(2), the court expressly announced that "[h]aving -- considering these things, the Court does not find that it is appropriate to have a sole plan of reunification."

Admittedly, it could be argued that because the juvenile court also mentioned FL § 5-525(f)(1), this demonstrates that it considered the requisite factors under FL § 5-525(f)(1)

- 36 -

and that the court was not required to announce findings as to the factors on the record, and that a court is presumed to know the law. We have "frequently said that we presume that trial judges know and apply the law in making rulings and rendering decisions, unless we have reason to think otherwise." Harris v. State, 458 Md. 370, 412, 182 A.3d 821, 846 (2018) (citation omitted). However, the concept that a trial judge is presumed to know the law and apply it properly applies only where there is no "misstatement of law or conduct inconsistent with the law" on the judge's part. Id. at 412, 182 A.3d at 846 (citation modified).

In this case, the juvenile court specifically announced that the basis for its ruling changing K.B.'s permanency plan was CJ § 3-816.2 and discussed the factors set forth in CJ § 3-816.2 that it considered in reaching its decision. Removing any doubt as to the basis of its ruling, after announcing the change of the permanency plan, the court stated: "The Court finds the due process was -- of Mother has been satisfied as there was notification of the request to change the plan within the Court report, and the Court finds that the Court has authority to consider it within the statute, under 3-816.2." The court's statements during the hearing negate the possibility of applying the principle that judges are presumed to know the law or of concluding that without saying so the judge considered the factors set forth in FL § 5-525(f)(1). It would be contrary to the court's own remarks to conclude that the court considered the factors set forth in FL § 5-525(f)(1) for determining a permanency plan when the court announced that the plan had already been "determined"

- 37 -

and that it had ordered under CJ § 3-816.2 that the plan be changed to a concurrent plan of

reunification and adoption.[14]

Also, the manner in which the court purported to "change" the permanency plan

appeared to run afoul of our case law and CJ § 3-823(g). In <u>Karl H.</u>, 394 Md. at 405, 422,

906 A.2d at 899, 909, in deciding whether a permanency plan determined at a permanency

plan hearing was immediately appealable, we cautioned that a concurrent plan of

reunification and adoption must be scrutinized carefully. We issued this guidance even

though the concurrent plan at issue had been established at a scheduled permanency plan

hearing, not an earlier point. We pointed out that, "[w]hen a permanency plan for adoption,

whether with a concurrent goal of reunification or adoption alone, is ordered, the statute

requires the filing of a TPR petition[.]" <u>Id.</u> at 422, 906 A.2d at 909. We observed that FL

§ 5-525(d) allowed for the contingency planning of reunification and adoption and stated

that, "in some cases, that may be the most prudent thing to do, so that if, when the

---

[14]After discussing factors set forth under CJ § 3-816.2 and ruling that a sole plan of reunification was not appropriate, the juvenile court stated:

> [T]he Court finds that under the statute the Court has authority to consider, under Family Law Article Section 5-525 F1, other plans that would be appropriate. And in viewing those things the Court adopts the recommendation of the Department and child's Counsel to change the plan at this time to reunification concurrent with adoption by a non-relative, because looking at the history that Mother has with the Department, the Court finds that there has to be a dual path for this child.

If anything, the court's remarks demonstrate that it did not view consideration of the factors set forth under FL § 5-525(f)(1) to be mandatory in determining whether to "change" the permanency plan. In the court's view, the permanency plan had already been determined at the disposition hearing and, under CJ § 3-816.2(c), it was able to review the permanency plan.

permanency plan is next reviewed by the court, the court concludes that adoption or [an]other long-term arrangement is appropriate, that goal can be achieved more expeditiously[.]" Id. at 422, 906 A.2d at 909.

In this case, the juvenile court neither ordered the Department to file for guardianship nor scheduled a TPR hearing, in place of a 6-month review hearing. Rather, the court scheduled the next review hearing for April 7, 2025 (less than a month after the exceptions hearing), stating that, at that time, the court would see whether Mother's compliance "should equate or equal to different terms of visitation" and that the permanency plan hearing was scheduled for "January [sic] 16, 2025[.]" That the juvenile court did not follow the mandate of CJ § 3-823(g), after ordering that the permanency plan be a concurrent plan including adoption, suggests that the court did not appreciate the significance of changing the plan to a concurrent plan of reunification and adoption, and that the court failed to carefully scrutinize the effect and goal of the concurrent plan.

The Department contends that "[d]eeming the permanency plan unlawful because the hearing was styled as a review hearing, rather than a permanency planning hearing, would improperly elevate form over substance." (Citation omitted).[15] This is not so. The

---

[15]The Department cites In re Adoption/Guardianship of Darjal C., 191 Md. App. 505, 532, 992 A.2d 503, 519 (2010), which quotes S. Easton Neighborhood Ass'n, Inc. v. Town of Easton, 387 Md. 468, 495, 876 A.2d 58, 74-75 (2005), for the proposition that "adherence to form over substance . . . is neither required nor desired if actual consideration of the necessary legal considerations [is] apparent in the record." But, Darjal C. does not squarely govern and S. Easton Neighborhood Ass'n, Inc. does not concern juvenile court proceedings and is not applicable.

In Darjal C., 191 Md. App. at 510, 529, 992 A.2d at 506, 517, the Appellate Court held that mother's counsel lacked standing to file an appeal on her behalf and dismissed

juvenile court erred in purporting to change the permanency plan at the initial review hearing because a permanency plan had not been determined pursuant to CJ § 3-823(e)(2) and FL § 5-525(f)(1) and the substance of the hearing did not satisfy the statutory requirements for determining a plan.  In addition, the advisement in the adjudication/disposition order did not provide notice that, at the initial review hearing, a permanency plan determination would occur.  See CJ § 3-823(c).

The Department contends that because Mother received notice at disposition that the permanency plan could be changed at any time and she received the Department's January 7, 2025 report, which included its permanency plan recommendation, the court was able to change the permanency plan at the initial review hearing.  However, CJ § 3-823(c) requires that notice of a permanency plan hearing be given.  After stating in section (b) that a permanency plan hearing may be held on the same day as a reasonable efforts hearing, CJ § 3-823(c)(1) provides that the court, on its own motion or at the written request of a party, may schedule a hearing at any earlier time to determine a permanency plan.

_____

the appeal.  The Appellate Court also determined that even if the appeal had been properly taken, mother would not have prevailed.  See id. at 529, 992 A.2d at 517.  The Appellate Court explained that the juvenile court did not err in terminating mother's parental rights because the record demonstrated that the court had "carefully analyzed and applied" the factors set forth in FL § 5-323(d) prior to a remand of the case and that the court had relied on its prior discussion of the FL § 5-323(d) factors in ruling that mother was unfit.  Id. at 532, 992 A.2d at 519.  In the process of reaching this conclusion, the Appellate Court stated that the "incantation of the 'magic words' of a legal test, as an adherence to form over substance" is not required "if actual consideration of the necessary legal considerations [is] apparent in the record."  Id. at 532, 992 A.2d at 519 (citation modified).  The Appellate Court's reasoning does not support the Department's argument.  Instead, the Appellate Court was clear that actual consideration of the necessary legal considerations must be apparent in the record, which is far from the situation in this case.

This language sets forth the requirement that, if the court intends to determine a permanency plan earlier than the permanency plan hearing date, the court must "schedule" a hearing at an earlier date and time to determine the plan. We need look no further than the plain meaning of the word "schedule" to conclude that the court must provide notice of the reason for the hearing if it intends to conduct a permanency plan hearing earlier than the designated date.

The word "schedule" is defined as "to arrange that an event or activity will happen at a particular time[.]" *Schedule*, Cambridge Dictionary (Cambridge Univ. Press & Assessment 2026), available at https://dictionary.cambridge.org/us/dictionary/english/schedule [https://perma.cc/K2LZ-CVWD]. "Schedule," as a verb, as it is used in CJ § 3-823(c)(1), means "to appoint, assign, or designate for a fixed time" or "to place in a schedule" and, the legal definition of the word means, among other things, "a plan that indicates the time and sequence of each element[.]" *Schedule*, Merriam-Webster Dictionary (Merriam-Webster, Inc. 2026), available at https://www.merriam-webster.com/dictionary/schedule [https://perma.cc/Z73G-EDKR]. "[S]chedul[ing] a hearing at any earlier time to determine a permanency plan" necessarily requires that the court provide not only notice of the date and time of the hearing but also of its purpose. CJ § 3-823(c)(1).

For a myriad of other reasons, the juvenile court may not, without notice, conduct a permanency plan hearing under CJ § 3-823 in place of a status/initial review under CJ § 3-816.2. Determining a permanency plan for a child who has been committed to an out-of-home placement is critical to a child's long-term well-being. The permanency plan defines the intended permanent placement of the child and must be in the child's best interests.

- 41 -

See Damon M., 362 Md. at 436, 765 A.2d at 627-28.  This Court has held that, given the significance of a permanency plan, an order changing a permanency plan for a child adjudicated a CINA from reunification to a plan of adoption or foster care is immediately appealable.  See id. at 438, 765 A.2d at 628-29.  It would defy common sense to conclude that a hearing this significant, the outcome of which is immediately appealable, may be held without the parties being given notice of the purpose of the hearing.

Once a permanency plan has been determined pursuant to the factors required by CJ § 3-823(e)(2) and FL § 5-525(f)(1), the juvenile court must conduct a hearing to review the plan at least every 6 months until the child's commitment is rescinded.  See CJ § 3-823(h)(1).  CJ § 3-816.2(c) allows the substitution of a permanency plan review hearing for a status review hearing but not vice versa.  No statute in the subtitle governing CINA cases provides that an initial review hearing or a status review hearing may substitute for a permanency plan hearing or a permanency plan review hearing.  Thus, there is no statute or case law that would provide notice that a child's permanency plan could be determined or changed at an initial or status review hearing.  In fact, because CJ § 3-816.2(c) states the opposite, it would be logical for a party to infer that because the statute specifies that permanency plan review hearings may take the place of status review hearings, the reverse is not authorized.[16]  Although the form order completed by the juvenile court after the

---

[16]Moreover, in this case, given that the permanency plan hearing had been scheduled for June 16, 2025, and had not been cancelled or rescheduled for the date of the initial review, it would not have been reasonable to expect a party to infer that the recommendation in the Department's January 7, 2025 report meant that the permanency plan would be determined or changed at the initial review hearing.

initial review hearing in this case contains preprinted language referencing the court making a finding about a child's permanency plan, this does not mean that an initial review hearing may substitute for a permanency plan hearing or a permanency plan review hearing conducted pursuant to CJ § 3-823(e)(2) and FL § 5-525(f)(1), and CJ § 3-823(h), respectively.[17]

We are mindful that under certain circumstances the juvenile court may waive the requirement that reasonable efforts be made toward reunification and that if a waiver finding has been made, the local department shall request that a permanency plan hearing be held in accordance with CJ § 3-823 within 30 days after the court makes the finding. See CJ § 3-812(c), (e). CJ § 3-812(c) provides that, "[i]f the local department determines after the initial petition is filed that any of the circumstances specified in subsection (b) of

---

[17]We are aware that the initial review hearing order template/form used in this case contains language indicating that a permanency plan other than reunification may be determined at an initial review hearing. Language on the form order indicates that a court may find by a preponderance of the evidence that a permanency plan is reunification concurrent with, among other things, placement with a relative, adoption, and guardianship. The order does not include as a designation the option of a permanency plan of reunification alone, which is the presumptive permanency plan after disposition, or mention consideration of CJ § 3-823 and FL § 5-525(f)(1). To the extent that the preprinted order suggests that the juvenile court may determine a permanency plan other than reunification at an initial review hearing or that a permanency plan may be determined by a preponderance of the evidence without consideration of the factors required by CJ § 3-823(e)(2) and FL § 5-525(f)(1), the appropriate outcome is for a jurisdiction using such an order to revise the form to include the option of reunification as the sole permanency plan after an initial review hearing at which, generally, the determination of a new permanency plan would not be expected to occur, and to make clear that if a permanency plan is to be determined at a hearing, notice must be provided and the determination of a permanency plan requires consideration of the factors set forth by CJ § 3-823 and FL § 5-525(f)(1). The appropriate outcome is not for this Court, based on language on a form order, to reach a result that is not warranted under CJ § 3-823 and FL § 5-525(f)(1).

- 43 -

this section exists, the local department may immediately request the court to find that reasonable efforts to reunify the child with the child's parent or guardian are not required." In this case, though, despite Mother's history, the Department did not request that the court make a finding that Mother's history warranted a waiver of the requirement that it make reasonable efforts toward reunification and, therefore, the Department had no obligation to request that the permanency plan hearing be expedited. <u>See</u> CJ §§ 3-812(e)(1), 3-823(b)(1)(ii). Nothing in this opinion should be interpreted to mean that a court may not waive pursuant to CJ § 3-812(d) the requirement that reasonable efforts be made to reunify a child with the child's parent or guardian if the court finds that any of the circumstances specified in CJ § 3-812(b) exist—namely, that the case involves chronic abuse, chronic and life-threatening neglect, sexual abuse, torture, crimes of violence, or a prior involuntary termination of parental rights.

Although we conclude that, in this case, the juvenile court did not consider the FL § 5-525(f)(1) factors or sufficiently scrutinize the concurrent permanency plan, we recognize that it is important for the best interests of the children involved that the CINA permanency plan determination process retain flexibility. We do not set forth a bright-line rule that a juvenile court may never determine a permanency plan at an initial review hearing. With proper notice to the parties concerning the reason for the hearing and appropriate consideration of CJ § 3-823 and FL § 5-525(f)(1) and any other applicable authority at the hearing, the juvenile court may determine a permanency plan at any time within 11 months after a child enters an out-of-home placement. <u>See</u> CJ § 3-823(b)(1), (c)(1).

For the reasons discussed herein, we affirm the judgment of the Appellate Court, reversing the juvenile court's judgment and remanding the case to that court for further proceedings consistent with its opinion. On remand, the juvenile court shall schedule a permanency plan hearing to be held no later than 45 days from the date of this opinion and determine, pursuant to CJ § 3-823 and FL § 5-525(f)(1), a permanency plan for K.B.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED. COSTS TO BE PAID BY PETITIONER.**